### In the Matter of the Complaint of INGRAM BARGE COMPANY.

### Civ.A.No. 97–226–A–1.

United States District Court, M.D. Louisiana.

March 23, 1999.

Walter C. Dumas, Walter C. Dumas & Associates, Inc., Baton Rouge, LA, John J. Cummings, III, Cummings, Cummings & Dudenhefer, New Orleans, LA, S. Gene Fendler, Liskow & Lewis, New Orleans, LA, Paul H. Spaht, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, LA.

### RULING ON MOTION IN LIMINE TO EXCLUDE NACHMAN BRAUTBAR AS AN EXPERT WITNESS

RIEDLINGER, United States Magistrate Judge.

This matter is before the court on the motion of limitation plaintiffs Ingram Barge Company and Ingram Ohio Barge Company (Ingram) to exclude Dr. Nachman Brautbar as an expert witness. Record document number 3818. The motion is opposed.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court instructed district courts to function as gatekeepers and to permit only reliable and relevant expert testimony to be presented to the trier of fact. The district court must be assured that the proffered witness is qualified to testify by virtue of his "knowledge, skill, experience, training or education." Rule 702, Federal Rules of Evidence. A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir.1999).

The primary focus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. "*If scientific,* technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" the expert "may testify *thereto.*" The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. But, in order to qualify as "scientific

knowledge" an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert,* 509 U.S. at 589–90, 113 S.Ct. at 2794–95 (emphasis in original) (internal citations omitted).

■ The Court enumerated a five-factor, non-exclusive, flexible test for district courts to consider when assessing whether the methodology is scientifically valid or reliable. These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.,* at 593–95, 113 S.Ct. at 2796–97.

■ To determine the admissibility of expert testimony the district court, applying Rule 104(a), Federal Rules of Evidence, conducts preliminary factfinding in order to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. at 2796.

■ This preliminary factfinding, assessment of the expert's reasoning or methodology, and the application of the *Daubert* factors is required not only in cases of "hard science," but also when the case involves questions of medical causation. *Moore v. Ashland Chemical, Inc.,* 151 F.3d 269 (5th Cir. 1998).

Thus, the party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable. This requires some objective, independent validation of the expert's methodology. The expert's assurances that he has utilized generally accepted scientific methodology is insufficient. *See Daubert v. Merrell–Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995) (on remand). The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable. *See In Re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717 (3rd Cir.1994); *see also* 2 Stephen A. Saltzberg, et al., Federal Rules of Evidence Manual 1229–40 (7th Ed.1998).

*Moore,* 151 F.3d at 276.

### Dr. Brautbar's Qualifications

■ The Claimants' Steering Committee (CSC) identified Dr. Nachman Brautbar as its expert in the fields of toxicology and internal medicine. A review of Dr. Brautbar's curriculum vitae, expert report, and deposition testimony supports the finding that he is qualified to offer expert testimony in the fields of toxicology and internal medicine.[1] Dr. Brautbar is board certified in internal medicine. Although he is not board certified in toxicology, his medical practice encompasses this field, and he has taught and written extensively in this field. *See,* e.g., Brautbar CV, p. 5; Brautbar expert report, Ingram Exhibit C, pp. 1–2.

### Dr. Brautbar's Opinions

■ To determine whether Dr. Brautbar's testimony should be admitted the court must first determine what that testimony is or will be. Dr. Brautbar's expert report begins with several paragraphs setting forth his qualifications. Brautbar expert report, pp. 1–2, ¶¶ 1–7. Next, he set out the factual information upon which he bases his conclusions and opinions. *Id.,* at pp. 2–12, ¶¶ 8–10. His conclusions and opinions followed.

---

1. Pursuant to the order issued December 21, 1998, record document number 3765, the CSC provided the court with a copy of Dr. Brautbar's curriculum vitae. His deposition testimony and expert report were submitted by Ingram as Exhibits A and C, respectively, to its motion in limine.

Brautbar expert report, pp. 12–13, ¶¶ 11–13. These are:

11. As a result of these releases, patients exposed must be evaluated for neurotoxic damages, pulmonary toxic damages, ear, nose and throat damages, and dermatological damages. The fear of cancer which is a common complication of exposure to known carcinogenic agents must be considered as well. As a result of neurotoxic exposure, loss of memory, concentration ability and cognitive function is known to result from the exposure described above.

12. As a result of these releases, patients were exposed to carcinogenic agents and as such their risk of developing cancer has increased significantly as compared to the non-exposed normal population. As such, the patients will require future medical monitoring to early detect, cure and prevent cancers which are known to be caused by exposure to benzene and toluene. This requires examination twice a year by a specialist to include blood work, urine work, gastrointestinal analysis, chest x-ray, and pulmonary function tests.

13. The peer reviewed scientific literature is replete with well-defined information describing the carcinogenicity of benzene, the neurotoxicity of benzene, the liver toxicity of benzene, the pulmonary toxicity of benzene. The peer reviewed scientific literature is also replete with descriptions of the neurotoxicity of toluene, pulmonary toxicity of toluene, dermatotoxicity of toluene, liver toxicity of toluene, and hematotoxicity of toluene.

Dr. Brautbar concluded his report with a listing of the scientific literature referred to in paragraph 13 of his report.

In response to Ingram's motion in limine, which the CSC described as "attempting to confuse the issues," the CSC asserted that Ingram "misunderstands or is mischaracterizing Dr. Brautbar's testimony." Opposition memorandum, p. 5. The CSC explained:

> Dr. Brautbar has opined that medical testimony or monitoring is required to early detect, relieve or cure cancer as a result of exposure to the release of Benzene in March of 1997. He is not offering an opinion as to which individuals have been exposed. He was not asked to identify individuals or population sectors subject to the risk of developing medical problems. He has reviewed reports of the incident and the types and levels of chemicals present. He has also reviewed scientific and medical literature. Through his review, and with his substantial background and expertise, Dr. Brautbar has come to the conclusion that there were levels of hazardous chemicals present in Baton Rouge in March of 1997 which require medical testing or monitoring for those individuals exposed thereto.

*Id.*

### Testing Dr. Brautbar's Opinions

None of the five factors from Daubert have much applicability to Dr. Brautbar's opinions. Some of the difficulty stems from the admitted fact that he does not offer an opinion that any particular individual, identified group of individuals, or an identified population has been exposed to a harmful level of any hazardous chemical.[2] The remaining difficulty arises from the fact that Dr. Brautbar expresses expert opinions, yet does not identify any scientifically valid reasoning or method-

---

**2.** "Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).

Although Dr. Brautbar in his report reiterated a great deal of information regarding the history of the incident and presented several pages of information regarding air monitoring data, he did not link air monitoring data to any actual claimant exposures. Principally because Dr. Brautbar's opinions are not related to any particular individual, group of individuals, or claimant population, the CSC also has not and cannot show that Dr. Brautbar's theories have been generally accepted in the scientific community. *See,* e.g., Brautbar's deposition testimony, Ingram exhibit A, at pp. 335–39.

ology underlying these opinions. Dr. Brautbar could point to no studies or peer-reviewed literature which suggested that the testing and monitoring he recommends should be performed, although he claimed that it was fairly standard care in cases of exposure to other carcinogenic agents. Brautbar's deposition, Ingram Exhibit A, p. 338.

Dr. Brautbar's theories have not been published or peer-reviewed, and the CSC does not claim otherwise. Neither Dr. Brautbar nor anyone else has tested his theory that the claimants alleging an exposure to any carcinogenic agent or hazardous substance which escaped from the overturned barge have a significantly increased risk of developing cancer as compared to the non-exposed population. Although he recommended testing twice a year, which would include blood work, urine work, gastrointestinal analysis, chest x-rays and pulmonary function tests, there is no evidence that any of the claimants have undergone such testing.[3] Consequently, there is no evidence from which to determine whether, in fact, allegedly exposed claimants have a significantly increased risk of developing cancer. Nor has Dr. Brautbar identified any published studies in which such testing was performed and the results demonstrated an increased risk of cancer in a similarly exposed group.

Although Dr. Brautbar's expert report referred to "peer-reviewed scientific literature," listed 12 published articles, and he referred to some sources in his deposition, he did not link the findings in any of them to his recommendation for twice a year testing nor his opinion that exposed claimants have a significantly increased risk of developing cancer. Dr. Brautbar did not claim that he used any existing studies, or extrapolated from

them by applying his scientific and medical knowledge, in order to reach his conclusions.[4] One can only infer from Dr. Brautbar's failure to articulate his methodology that there is none.

In sum, the CSC has not shown that there is any support in the medical or scientific literature for Dr. Brautbar's opinion that all of the claimant's alleging exposure have an increased risk of developing cancer, and must be evaluated for neurotoxic, pulmonary, dermatological and other harmful effects from the claimed exposure.[5]

### The Helpfulness of Dr. Brautbar's Testimony and Opinions

Dr. Brautbar's testimony and opinions are likely to be of little assistance to the trier of fact in understanding the evidence or determining the issues to be resolved in this case. His 13 page report and nearly 350 pages of deposition testimony can be reduced to the following statement: Somewhere in the Baton Rouge area from March 17 to March 28, 1997, some people were exposed to harmful levels of hazardous chemicals which will require that they be tested or monitored to some degree. Beyond that, Dr. Brautbar's opinions are nothing more than "unscientific speculation offered by a genuine scientist." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996), *cert. denied*, 519 U.S. 819, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996) (internal citation omitted), *cited in*, *Moore*, 151 F.3d at p. 278.

### Conclusion

To the extent that Dr. Brautbar is offered by the CSC as an expert in the fields of toxicology and internal medicine to testify generally regarding the symptoms associated

---

**3.** Insofar as Dr. Brautbar is of the opinion that twice yearly testing is needed to assess the claimants' increased risk of developing cancer, it does not appear that Dr. Brautbar's opinion proposes to include any unusual or non-standard medical tests.

**4.** For example, some of the literature referenced in Dr. Brautbar's expert report involved chronic exposure by Chinese and other industrial workers. *See,* Ingram's Exhibits C, D, ¶¶ 7 and 9, and E, ¶¶ 6 and 7. Such circumstances are clearly distinguishable from the facts presented to Dr.

Brautbar in this case. Yet, there is nothing in the export report or deposition testimony to explain how these studies in fact support the opinions he rendered regarding the Ingram claimants.

**5.** The CSC's opposition to Ingram's motion is telling. It focuses almost exclusively on Dr. Brautbar's qualifications and fails to specifically address Ingram's assertions that Dr. Brautbar's opinions lack scientifically valid reasoning and methodology.

with and the harmful effects of exposure to benzene, toluene, styrene, and xylene, it appears that he is qualified to do so, and that his testimony would be helpful to the trier of fact to determine whether any claimant has been harmed by exposure to these substances. Insofar as Dr. Brautbar would testify that the claimants alleging exposure to these substances at whatever level must be evaluated for neurotoxic, pulmonary, dermatological and other damages, his testimony should not be allowed. Likewise, insofar as Dr. Brautbar would testify that claimants alleging exposure to these substances at any level have a significantly increased risk of developing cancer as compared to the non-exposed population, as a consequence of which they require examination twice a year by a specialist, his testimony should not be allowed. His opinions and testimony are not the result of a scientifically valid methodology and are not reliable.

Accordingly, the motion in limine of Ingram Barge Company and Ingram Ohio Barge Company to exclude Dr. Nachman Brautbar as an expert witness is granted in part and denied in part. Dr. Brautbar may testify as an expert in the fields of toxicology and internal medicine generally regarding symptoms caused by and the harmful effects of exposure to benzene, toluene, styrene and xylene. He may also offer his testimony regarding his own background, education, experience and qualifications as an expert in these two fields so that the court may have a sufficient basis upon which to weigh his testimony. In all other respects, his testimony is not allowed.