In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1032

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ROBERT P. CROTTEAU,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99 CR 70--John C. Shabaz, Chief Judge.

Argued May 17, 2000--Decided July 10, 2000

Before BAUER, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.  On July 14, 1999, a grand
jury returned a one-count indictment charging the
defendant-appellant, Robert Crotteau, with
"knowingly and unlawfully [taking], by force and
violence, and by intimidation, from the person
and presence of others, money totaling
approximately $1,430," in violation of 18 U.S.C.
sec.sec. 2113(a) and (d), and after a jury trial,
he was found guilty as charged. Following the
sentencing hearing, the trial court sentenced him
to 87 months' imprisonment, restitution in the
amount of $1430, a $100 special assessment, and
5 years' supervised release. On appeal, Crotteau
challenges: 1) an evidentiary ruling granting the
government's motion to exclude the defendant's
psychologist from offering expert testimony; 2)
the court's ruling striking the testimony of
defendant's proffered expert regarding the height
of the bank robber; 3) the sufficiency of the
evidence supporting his conviction; and 4) the
content of a note sent to the jury by the trial
judge. We affirm.

I.  BACKGROUND

   In late 1996 and early 1997, the defendant,
Robert Crotteau, was living at 2202 26th Avenue,
Rice Lake, Wisconsin,/1 approximately 3 miles
by car, and 1 miles by snowmobile, from the town

of Brill, Wisconsin. A major state snowmobile trail ran from the back of the property into Brill.

During late 1996 and early 1997, Crotteau talked with David Demars about the possibility of robbing a bank, specifically the Brill State Bank, because both of them were in need of money. Demars and Crotteau concluded that it would be best to rob the bank in the early morning when the tills were still full of money. They also concluded that it would be best to rob the bank when the weather was snowy because it would be harder for law enforcement to track them, or to even respond to a robbery. Also during the conversation, Demars and Crotteau discussed using a snowmobile as a getaway vehicle. Finally, they discussed the best weapon to use and Demars suggested using Crotteau's black BB gun, which looked like a semi-automatic pistol, because Demars thought that a prison sentence would be shorter if a BB gun was used instead of a real gun. During this time period, Crotteau also had a conversation with his friend, Daniel Swanson, in which the defendant discussed robbing a bank in bad weather.

1.  The Brill State Bank Robbery

January 10, 1997, was a windy, snowy day in the Rice Lake, Wisconsin area, and at approximately 9:20 a.m., a man wearing dark knit gloves, a hooded army-type jacket, and a ski mask, exposing only his eyes, entered the Brill State Bank, carrying a black gun that resembled a semi-automatic pistol in his left hand and a cream colored canvas bag with some red on its side in his right hand. While displaying the weapon to the bank teller, Janice Saffert, the man demanded "I want your 20s in the bag." Saffert complied and placed $1430 into the bag, and upon receiving the bag of money, the robber fled the bank on foot and made his escape, apparently unobserved by any witnesses.

Immediately following the robbery, Saffert reported to the police that the bank robber was approximately 5'2" in height, but after viewing the bank surveillance video and seeing that the robber was leaning over on the teller's counter, she stated that the robber's height was 5'8" or 5'9". She also described for the authorities the gun used by the robber, his clothes, gloves, mask, body shape, voice, and eyes, as well as his race and approximate age.

2. The Victim's Report of the Robber's Return to the Bank

On October 17, 1997, the defendant, Crotteau, went to the Brill State Bank to exchange coins for currency and the teller that assisted Crotteau on this occasion happened to be Janice Saffert, the victim teller from the January 10, 1997, robbery. On this October day, Crotteau had a bag in his right hand, apparently similar to the one used in the robbery, which he placed on the teller's counter. Upon seeing Crotteau at her counter, Saffert thought to herself, "Oh my God, I think he's the one." According to Saffert, her heart was beating fast, her hands became sweaty, and her knees were wobbly. As she was counting the coins for Crotteau, Saffert tried to get a closer look at him. When she returned to her teller station after counting the coins, she asked Crotteau a few questions, including his name, in order that she could hear his voice and compare it with the robber's. After Crotteau left the bank building, Saffert informed her co-workers that he was the robber. One of her co-workers followed Crotteau out of the bank and wrote down his vehicle license plate number, in hopes of assisting law enforcement in apprehending him.

3.   The FBI Investigation

As a result of the encounter on October 17, 1997, Janice Saffert was certain that Crotteau was the man who robbed her on January 10, 1997. The authorities were then notified, and the FBI commenced an investigation of Robert Crotteau as a possible suspect. Crotteau and many of his family members and friends were interviewed by the FBI and local law enforcement officials. David Demars told investigators that, after the January 1997 Brill bank robbery, Crotteau gave him cash in amounts ranging from $20 to $80 for items he wanted to buy on five or six occasions. Prior to the robbery, Demars and Crotteau occasionally hunted for cigarette butts to smoke, but after the robbery, there were times when Crotteau bought packs of cigarettes for Demars and his wife. Additionally, whereas in late 1996 and early 1997 the two men would often talk about robbing banks to get some extra money, after the bank robbery, Crotteau would either change the subject or ignore Demars whenever he brought up the possibility of committing a bank robbery. Finally, Demars viewed the bank surveillance video of the robbery and concluded that, based on the robber's build, his walk, and the way he carried himself, the robber looked very much like Robert Crotteau.

David Demars' wife, Crystal Demars, was also interviewed by law enforcement authorities

regarding the robbery. She had known Crotteau for six years at the time of the interview and had lived with him for some time at the house in Rice Lake. She viewed the surveillance video and also concluded that, based on the way the robber walked and carried himself, he was Robert Crotteau.

Jennifer Burt, Crotteau's former girlfriend who lived with him on the Demars' property at the time of the Brill State Bank robbery, was interviewed by local law enforcement officers in the Rusk County, Wisconsin jail where she was incarcerated at the time. The officers showed Burt both the October 17, 1997 bank video and the video of the robbery on January 10, 1997. Without hesitation, Burt identified the individual in the October 17 surveillance video as Robert Crotteau. When shown the video of the robbery, her demeanor changed, she became very quiet, and she looked down at the floor, stating that she did not see anything that she recognized in the video. Burt viewed the video a second, and then a third, time, but both times she told the officers that she did not recognize anything in the video. As Burt was led back to her cell, she began to cry and was brought back to the video room, where she told the officer that it appeared to her that the person concealing his identity in the bank robbery video was Robert Crotteau. Burt advised the officer that she was due to be released from jail soon and that she did not want to be called to testify.

David Apfel, also a close friend of Crotteau, stated during an interview with the FBI that Crotteau told him that he (Crotteau) had to be careful because the FBI was watching him for the Brill State Bank robbery. When Apfel asked Crotteau why he was not spending the money he had obtained in the heist, the defendant said "something like maybe some day or something like that."

David and Crystal Demars and Jennifer Burt all told the FBI that Crotteau had access to, and occasionally was observed wearing, green Army jackets, snowmobile boots, black stretch gloves, and a snowmobile mask. They also stated that he had a BB gun that looked exactly like the one seen in the Brill bank robbery surveillance video. Burt, Crotteau's girlfriend, had a cream-colored bag with "Marlboro" in red letters on the side when she lived with him and she left it with the defendant after she moved out.

When the FBI interviewed Crotteau in July of 1999, he told them that in January of 1997, he was 18 years old, 5'9" to 5'10" tall, and weighed approximately 150 pounds. He also denied that he

had ever jokingly, much less seriously, discussed robbing a bank with his friends. Crotteau also told the FBI that he was not involved in the Brill State Bank robbery, had never worn an Army-type jacket or Parka, and that he never owned nor wore snowmobile-type boots with the fur lining sticking out at the top. Furthermore, he insisted that he never had a canvas bag with red lettering on it, and that he had never seen such a bag nor had he ever seen his girlfriend in possession of such a bag. Crotteau did admit to the FBI that he owned BB pistols that looked like semi-automatic weapons (like the one used in the Brill bank robbery).

4. Crotteau's Trial By Jury

On October 12 and 13, 1999, Crotteau was brought to trial before a jury in the Western District of Wisconsin. At the final pre-trial hearing on October 8, 1999, the government filed a motion to exclude the defendant's psychologist from testifying as an expert on the reliability of eyewitness identification. The district court reserved ruling on the motion until such time as it could be considered in light of the evidence offered at trial. The matter was again brought up on the second day of trial, October 13, 1999, after the close of the government's case. After defense counsel made an offer of proof, the trial court granted the motion to exclude the psychologist's testimony on the ground that it would not be helpful to the jury.

During the course of the trial, the defense called Ray Miller, a friend of Crotteau, to offer expert testimony on the height of the bank robber and the defendant by comparing the two bank video surveillance tapes offered at trial (one of the robbery and the other of Crotteau's October 17, 1997 trip to the bank to cash in his spare change). After the jury had heard Miller's testimony on direct and the government had cross-examined him, the government moved to strike Miller's testimony on the grounds that he was not a qualified expert under Fed. R. Evid. 702/2 and that his opinion was not admissible under Fed. R. Evid. 703./3 The trial judge granted the government's motion to strike the testimony and instructed the jury accordingly.

At the close of the government's case in chief, Crotteau moved for a judgment of acquittal under Rule 29./4 The judge denied Crotteau's motion, and the case went to the jury.

The jury started its deliberation at approximately 1:00 p.m. on October 13, 1999. At 3:57 p.m., the jury sent a written note

requesting a definition of reasonable doubt. The trial judge met with the parties and, after a brief argument, sent a note back to the jury at 4:45 p.m., stating as follows:

Members of the jury. No definition of reasonable doubt is available. The phrase is self explanatory and is its own best definition. Will you also join us in court at 6 p.m. for adjournment until 9 a.m. tomorrow.

Although he objected to the reasonable doubt statement and urged the court to craft a definition for the jury, counsel for Crotteau did not object to the last sentence of the note (regarding adjournment) when the court read the proposed note to the parties prior to sending it to the jury. At 5:30 p.m., the jury found Crotteau guilty of the robbery of the Brill State Bank on January 10, 1997.

Crotteau appeals from that conviction on numerous grounds. Specifically, he asks us to determine: 1) whether the district court abused its discretion by excluding expert testimony on the reliability of the eyewitness identification of the defendant made by the victim bank teller (Saffert); 2) whether the trial court abused its discretion by striking the testimony of a defense witness (Ray Miller), offering expert testimony as to the height of the bank robber; 3) whether the evidence is sufficient to sustain Crotteau's armed bank robbery conviction; and 4) whether the trial judge committed plain error by informing the jury, approximately four hours into its deliberations, that the court planned to adjourn for the day at 6:00 p.m.

II.  DISCUSSION

A. Exclusion of Expert Testimony Regarding Reliability of Eyewitness Identification

Initially, Crotteau contends that the district court erred when it excluded, as unhelpful to the jury, a psychologist's expert testimony on the reliability of eyewitness identification. The expert testimony was specifically designed to discredit the identification of Crotteau as the robber made by the victim bank teller, Janice Saffert, by demonstrating that Saffert may have suffered from a form of post-traumatic stress disorder as a result of the bank robbery. Thus, when Crotteau walked into the bank on October 17, 1997, carrying a bag similar to the one used in the robbery, Saffert experienced a flashback of sorts and would thereby not have been able to accurately identify Crotteau as the robber.

Given that there is no allegation that the

trial judge improperly applied the framework set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), we review the trial judge's decision to exclude expert testimony for an abuse of discretion. See United States v. Hall, 165 F.3d 1095, 1101 (7th Cir.), cert. denied, 119 S. Ct. 2381 (1999). Thus, our review focuses on the issue of whether the trial judge abused his discretion in not allowing this defense expert to testify.

As this court has explained, we afford great deference to a judge's evidentiary rulings:

We review a trial judge's determination of the admissibility of evidence under the abuse of discretion standard. We afford great deference to the trial court's determination of the admissibility of evidence because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of the judge's familiarity with the case and ability to gauge the impact of the evidence in the context of the entire proceeding. Indeed, [a]ppellants who challenge evidentiary rulings of the district court are like rich men who wish to enter the Kingdom: their prospects compare with those of camels who wish to pass through the eye of the needle. Because we give special deference to the rulings of the trial judge[,] [a defendant] obviously "carries a heavy burden. In this context, we will not reverse unless the record contains no evidence on which [the district court] rationally could have based [its] decision, or where the supposed facts found are clearly erroneous. Moreover, if an error in the admission or exclusion of evidence was committed during the trial, the court will grant a new trial only if the error had a substantial influence over the jury, and the result reached was inconsistent with substantial justice.

United States v. Walton, 2000 WL 767891, *4 (7th Cir. June 14, 2000) (internal citations and quotations omitted) (brackets in original).

In Hall, this court identified three considerations which supported the trial court's exclusion of the proffered expert testimony regarding the reliability of eyewitness identifications in that case: 1) the opportunity for cross-examination; 2) the use of a cautionary instruction; and 3) the presence of corroborating evidence. See Hall, 165 F.3d at 1107-08. Each of these three factors is present in the instant case and each supports the decision of the trial judge to exclude the testimony of the expert psychologist.

As we stated before, "any weaknesses in

eyewitness identification testimony ordinarily can be exposed through careful cross-examination of the eyewitnesses." Hall, 165 F.3d at 1107 (citations omitted). Furthermore, Crotteau's counsel cross-examined Saffert extensively on the potential problems of her eyewitness testimony and was given ample latitude to argue this to the jury. As the district judge noted, the victim bank teller was on the stand, on direct and cross, for a total of approximately one and one-half hours. Defense counsel led her step-by-step through the day that Crotteau came into the bank on October 17th, with the teller admitting that her heart was racing, her knees were wobbly, her hands were sweating, and that she immediately thought Crotteau was the bank robber before she even heard his voice. Crotteau's counsel argued these facts to the jury, along with the fact that Crotteau came into the bank some 9 months after Saffert had been the robbery victim, and encouraged the jury to discredit the teller's eyewitness identification based on these facts. It was within the jury's province to choose to credit or discredit Saffert's testimony based on all of the facts before it. See id. ("[W]e believe that the credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury--determining the credibility of witnesses.") (citation omitted). Unfortunately for Crotteau, the jury elected to believe Saffert's testimony.

Additionally, the two instructions given to the jury by the trial judge regarding the credibility of the witnesses were certainly sufficient. The first was an instruction regarding the testimony of witnesses, taken directly from Seventh Circuit Pattern Instruction Section 1.03, and the second was a cautionary instruction drawn from Hall. The second instruction reads as follows:

You have heard testimony of an identification of a person. Identification testimony is an expression of belief or impression by the witness. You should consider whether, or to what extent, the witness had the ability and opportunity to observe the person at the time of the offense and to make a reliable identification later. You should consider the circumstances under which the witness later made the identification.

The government has the burden of proving beyond a reasonable doubt that the defendant was the person who committed the crime charged.

These two instructions properly cautioned the jury to carefully weigh all of the circumstances surrounding Saffert's identification of Crotteau

as the robber before reaching any conclusion.

Finally, there was substantial corroborating evidence to implicate Crotteau as the robber of the Brill State Bank. Again in Hall, we stated that when there is corroborating evidence, expert testimony regarding the reliability of eyewitness identification is not necessary. See id.; see also United States v. Kime, 99 F.3d 870, 885 (8th Cir. 1996) (court reluctant to find abuse of discretion in district court's decision to exclude expert testimony on eyewitness identifications "unless the government's case against the defendant rested exclusively on uncorroborated eyewitness testimony"). The testimony of David Demars, David Apfel, and Daniel Swanson all served to corroborate Saffert's identification of Crotteau as the robber by relating incriminating statements and actions made by Crotteau both before and after the robbery. David Demars, Crystal Demars, and Jennifer Burt also each identified Crotteau as the bank robber in the surveillance video based on the way the robber walked and carried himself. Finally, Crotteau's own statements to the FBI denying ever having owned or worn clothing worn by the robber corroborated the teller's identification because several other witnesses reported having seen Crotteau wearing such items on previous occasions.

Thus, we hold that the trial court did not abuse its discretion in excluding the expert testimony of the psychologist. Such testimony was not necessary because the defense extensively cross-examined the eyewitness regarding the reliability of her identification, the experienced trial judge provided the jury with clear, concise, and unambiguous cautionary instructions on the reliability of eyewitness identifications, and the teller's identification of Crotteau as the robber was substantially corroborated by other testimony offered at trial.


B. The Striking of Proffered Expert Testimony Regarding the Height of the Bank Robber

Crotteau next contends that the district court abused its discretion by striking the testimony of a would-be expert witness, Ray Miller, regarding the height of the bank robber in the video, on the grounds that the witness was not qualified as an expert under Fed. R. Evid. 702 because he lacked the education, knowledge, training, experience, and methodology necessary to qualify him as an expert. We review the district judge's decision to exclude expert testimony for an abuse of discretion. See Hall, 165 F.3d at 1101.

Ray Miller testified before the jury that he had examined the video surveillance tapes from the January 10, 1997 bank robbery, and from Crotteau's visit to the bank on October 17, 1997. Miller testified that based on his viewing of the tapes and some measurements that he took, he determined that the robber on the January tape was only 5'2", while Crotteau appeared to be approximately 5'8" on the October tape.

Miller testified that he left high school after his freshman year, was home-taught, and subsequently obtained his GED, that he had trained himself on the computer software that he used to reach his findings regarding the height of Crotteau and the robber, that he had but two years of experience with the personal computer, and that he would not call himself an "expert" in the field in which he was testifying. Furthermore, Miller admitted that he relied on information, such as a poor quality copy of the tapes rather than the originals, that an expert in the field would not have relied upon. Miller also offered his opinion that an expert in the field would likely have taken more measurements than the scant number taken by Miller in reaching his conclusions. In fact, Miller admitted that although he visited the bank to take some measurements, he did not measure the teller's counter, nor did he measure the victim teller herself. Thus, the government moved to strike Miller's testimony and the judge granted the government's motion, finding that Miller was not qualified as an expert under Fed. R. Evid. 702.

We hold that the trial court did not abuse its discretion in striking Miller's testimony. Based on the record before us and the facts elicited at trial regarding Miller's lack of qualifications and methodology as described above, we agree with the trial judge's ruling that Miller was not qualified to offer expert testimony on the height of the bank robber and Crotteau.

C. Sufficiency of the Evidence

Crotteau asks this court to reverse his conviction, claiming that the district judge erroneously denied his motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. We review the judge's denial of a motion for acquittal de novo. See United States v. Griffin, 194 F.3d 808, 816 (7th Cir. 1999), cert. denied, 120 S. Ct. 1546 (2000). "Viewing the entire record and accompanying inferences in the light most favorable to the Government, we affirm the district court's ruling as long as any rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." Id. (citing United States v. Hach, 162 F.3d 937, 942 (7th Cir. 1998), cert. denied, 119 S. Ct. 1586 (1999)). Where, as here, a defendant asks us to conclude that the evidence was insufficient to support his conviction, he faces a very high hurdle

because [w]hen reviewing a conviction for sufficiency of the evidence, we neither reweigh the evidence nor do we substitute our judgment of the facts for that of the factfinder. We consider the evidence in the light most favorable to the prosecution, making all reasonable inferences in its favor, and affirm the conviction so long as any rational trier of fact could have found the defendant to have committed the essential elements of the crime. Reversal is warranted only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt.

United States v. Hall and Walker, 2000 WL 626721, at *7 (7th Cir. May 16, 2000) (internal citations and quotations omitted) (brackets in original).

Much of Crotteau's argument regarding the sufficiency of the evidence centers around his apparent belief that many of the witnesses were not credible and their identifications of Crotteau were unreliable. He claims that Janice Saffert's eyewitness identification of Crotteau is unreliable because she could not remember the shape of the robber's eyes, she admitted that by listening to the voice of the robber he could have been one of her sons, and she described that the robber held his gun in his right hand when it was actually his left. Crotteau also argues that Crystal Demars' and Jennifer Burt's identifications of Crotteau as the robber in the bank surveillance tape were unreliable because both women testified that they were not absolutely certain that it was Crotteau in the video. Finally, he asserts that David Demars, Daniel Swanson, and David Apfel provided no evidence that Crotteau was the robber because they offered no testimony concerning any steps that were taken in preparation to rob the bank, but merely testified as to portions of discussions in which the men discussed the possibility of robbing the Brill State Bank.

We reject Crotteau's argument that the evidence was insufficient to support his conviction. All of his attacks on the evidence essentially are challenges to the credibility of the witnesses; attacks which are properly made before the jury, and not this court. See United States v. Woolfolk, 197 F.3d 900, 904 (7th Cir. 1999) ("Questions of witness credibility are reserved for the jury, and its assessments will not be

second guessed by an appellate panel."). Unfortunately for Crotteau, the jury resolved the credibility questions against him.

Based upon our review of the record, we reject Crotteau's claim on the sufficiency of the evidence because there was more than ample evidence from which a rational factfinder could have concluded beyond a reasonable doubt that Crotteau robbed the Brill State Bank in January of 1997.

D.   The Trial Court's Alleged Jury Coercion

After the jury had been deliberating for nearly three hours, it sent a written note to the court requesting a definition of reasonable doubt. The trial judge met with the parties to discuss how to proceed and, after a brief argument, sent a note in response to the jury at 4:45 p.m., stating as follows:

Members of the jury. No definition of reasonable doubt is available. The phrase is self explanatory and is its own best definition. Will you also join us in court at 6 p.m. for adjournment until 9 a.m. tomorrow.

Counsel for Crotteau did not object to the last sentence of the note (regarding adjournment) when the court read the proposed note to the parties before sending it to the jury. At 5:30 p.m., the jury sent a note stating that it had reached a verdict.

Crotteau contends that the trial judge coerced a guilty verdict when it informed the jury at approximately 4:45 p.m. that deliberations would end for the day at 6:00 p.m. and resume the following morning. Because Crotteau did not object to the note before the district court, we review Crotteau's claim for plain error. See United States v. Staples, 202 F.3d 992, 994 (7th Cir. 2000).

In determining whether the court coerced the jury into returning a guilty verdict, "[t]he relevant inquiry . . . is whether the court's communications pressured the jury to surrender their honest opinions for the mere purpose of returning a verdict." United States v. Kramer, 955 F.2d 479, 489 (7th Cir. 1992) (citations omitted). Instructions which are neutral and simply instruct the jury to continue in its deliberations do not warrant reversal. Id.

We hold that the language that the district court used in its note regarding the times for adjournment for the day and re-adjournment for

the next day did not, in any manner, coerce the jury into hastily reaching a guilty verdict. The note was neutral and favored neither the prosecution nor the defense; instead, the note merely responded to the jury's earlier question requesting a definition of reasonable doubt and advised the jury of the court's schedule.

This court has previously stated our approval of a schedule in which a judge adjourns "the jury's deliberations at a reasonable hour and require[s] them to come back the next day." United States v. Feekes, 879 F.2d 1562, 1567 (7th Cir. 1989). Although the jury came back with a guilty verdict forty-five minutes after receiving the note from the trial court, there is no evidence that it did so because it was coerced by the trial judge into reaching a guilty verdict. Thus, we are of the opinion that the court did not commit plain error in submitting the note to the jury.

The decision of the district court is

AFFIRMED.

/1 Crotteau lived with his sister, Danylle Demars, Danylle's brother-in-law, David Demars, David's wife, Crystal, and Jennifer Burt, Crotteau's then-girlfriend.

/2 Fed. R. Evid. 702 states as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

/3 Fed. R. Evid. 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

/4 Rule 29 of the Federal Rules of Criminal Procedure provides, in relevant part:

The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the

indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the government is not granted, the defendant may offer evidence without having reserved the right.