**Amanda J. RAMSEY, et al., Plaintiffs,**

v.

**CONSOLIDATED RAIL CORPORATION, et al., Defendants.**

**No. 3:97–CV–0764RM.**

United States District Court, N.D. Indiana, South Bend Division.

Aug. 29, 2000.

Mark Allen Scott, Daniel J. Harrigan, Bayliff Harrigan Cord and Maugans, Kokomo, for Amanda J. Ramsey, Peggy J. Ramsey, plaintiffs.

Harold Abrahamson, Michael C. Adley, Abrahamson, Reed and Adley, Hammond, Pierce Cunningham, Jonathan A Conte, Thomas H. Stewart, The Law Office of Pierce E. Cunningham, Cincinnati, OH, Paul V. Byrne, Jr., Law Office of Paul V. Byrne Jr., Oak Park, IL, for Consolidated Rail Corporation, Penn Central Corporation the aka American Premier Underwriters Inc, defendants.

### MEMORANDUM AND ORDER

MILLER, District Judge.

Amanda Ramsey, now aged 20, has a damaged liver. Because she and her mother believe her liver was damaged by drinking well water contaminated by releases of hazardous substances at a rail yard in Elkhart, Indiana, the Ramseys bring this suit against Conrail and Penn Central Corporation (its successor, American Premier Underwriters, Inc., is now the real party in interest, but the court will refer to Penn Central lest confusion arise about the rail yard). The court's jurisdiction is based on the parties' diverse citizenship. 28 U.S.C. § 1332. The Ramseys' ability to prove their claim depends on their ability to prove a causal link between those releases and her condition. Because the defendants don't think the Ramseys can prove such a causal link, they move for summary judgment, augmenting that motion with motions to strike evidence on which the Ramseys otherwise would rely.

The Ramseys proffer opinion testimony of Dr. Hendrick M. Haitjema, a hydrologist who believes his scientific modeling method shows that certain contaminants from the rail yard releases reached the Ramsey well, and the opinion testimony of

Dr. Nachman Brautbar, a physician who believes that Amanda Ramsey was exposed to heptoxic chemicals, carbon tetracholoride and tricholoroethylene, and that this exposure caused her to develop liver cirrhosis. The defendants move to strike the testimony of both Dr. Haitjema and Dr. Brautbar. The Ramseys don't claim an ability to prove their case without these witnesses' testimony.

There is no suggestion that Dr. Haitjema is not qualified as an expert within the meaning of the law of evidence. He has been employed since 1997 as a professor in the Indiana University School of Public and Environmental Affairs, teaching and researching in the field of groundwater flow. In the years before 1997, he taught geology and civil and mining engineering at Indiana University, Indiana Purdue University at Indianapolis, and the University of Minnesota. He has taught many short courses elsewhere, and participated in conferences and committees, on groundwater. He holds a Masters Degree in Civil Engineering (with a specialty in sanitary engineering) from the Delft University of Technology in the Netherlands, and a Ph.D. in Civil Engineering from the University of Minnesota, where his thesis addressed the modeling of three-dimensional flow in aquifers using distributed singularities (a topic on which the EPA provided Dr. Haitjema with $250,000 to fund a study in the mid–1990s). He has written scores of articles, papers, reports and monographs on the topic of groundwater. Dr. Haitjema is highly qualified to testify as an expert on the groundwater flow modeling.

Conrail and Penn Central raise no challenge, either, to Dr. Brautbar's qualifications to give expert testimony. For reasons discussed below, recitation of Dr. Brautbar's qualifications is unnecessary for today's decision, but they have been discussed in other reported opinions. See, e.g., *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir.1998); *In re Ingram Barge Co.*, 187 F.R.D. 262, 264 (M.D.La. 1999) ("he is qualified to offer expert testimony in the fields of toxicology and internal medicine. Dr. Brautbar is board certified in internal medicine. Although he is not board certified in toxicology, his medical practice encompasses this field, and he has taught and written extensively in this field.").

Dr. Haitjema would testify, according to his reports prepared and filed pursuant to Rule 26(a)(2)(B), Fed.R.Civ.P., along the following lines: the rail yard was operated by the New York Central and Penn Central from 1956 to 1976, and by Conrail after that. In 1986, a resident of the area just north of the rail yard reported elevated levels of volatile organic compounds—"VOCs"—in his well; that report triggered a sampling process that disclosed high levels of tricholoroethene—"TCE"—and carbon tetrachloride—$CC1_4$—in area groundwater and soil on the rail yard. An investigation by the Indiana Department of Environmental Management indicates that degreasing solvents and accidental spills may have contributed to the contamination.

Dr. Haitjema reports that the soils beneath the rail yard are disturbed, and that the groundwater elevations are rather shallow, allowing liquids released into the soil to reach the groundwater within hours or days. The groundwater velocities are rather high. Because Dr. Haitjema understands releases into the groundwater at the rail yard to have varied spatially and temporally, he believes the degree of groundwater contamination downgradient from the rail yard also would vary spatially and temporally; he believes statistical analyses of well sampling data from 1986 through 1989 support that belief. He believes the variations can be rapid, producing significant changes in the span of a year or two.

Based on observed piezometric head patterns and several groundwater flow modeling analyses, Dr. Haitjema believes, based among other things on his own several groundwater flow modeling efforts (employing various geohydrologic assump-

tions), that the groundwater beneath the rail yard flows in a northerly to northwesterly direction, with the water below the contaminated zones of the rail yard diverging into the residential areas to the north and northwest. From this, Dr. Haitjema opines that groundwater contaminated by releases at the rail yard may be expected in "the entire residential area north and northwest of the railyard."

Dr. Haitjema says groundwater sampling confirms this opinion. Consistently high concentrations of TCE and $CCl_4$ have been found in two distinct areas, and TCE and other VOCs (including breakdown products of TCE and $CCl_4$) have been found between those two plumes. The testing doesn't demonstrate an orderly plume with high concentrations near the railyard and the lowest concentrations near the point of discharge into the river; one testing site showed higher VOC levels than many wells to its south.

Dr. Haitjema reports that the Ramseys lived in the contaminated area, immediately north of what was, in 1993, the "hot spot" of TCE groundwater contamination. Dr. Haitjema concedes that testing of the Ramseys' well in 1993 didn't show detectable quantities of VOCs, but believes that "the described temporal and spatial variability in groundwater contamination does not make that sample representative for the entire period of the Ramsey residency (1983 to 1998)." In Dr. Haitjema's view, several factors make it very probable that the Ramsey well was contaminated for at least part of the time the Ramseys lived there: their well taps from the same depth as a contaminated well to their south; the highest of all residential well TCE concentrations were found just south of the Ramseys' residence; groundwater flow changes may have led contaminants from rail yard hot spots toward the Ramseys' residence; and variations in contaminant leaching beneath the railyard may have shifted the zone of high contamination to include the Ramseys' residence.

ConRail and Penn Central argue that Dr. Haitjema's opinions are not reliable. They note that the Environmental Protection Agency's studies (which were based on sampling more than eighty residential wells) show the Ramsey house outside the plume of contamination. They note that neither of the two samplings of the Ramsey well (once in 1988, once in 1993) detected TCE, $CCl_4$, or any degradation product of either. For that matter, they note, the wells of the two houses to the south of the Ramseys—in the direction of the plume of contamination as understood by the EPA—detected no TCE, $CCl_4$, or any degradation product when tested in 1986, 1989, 1992, 1993 and 1994. The EPA ordered that residents in the contamination plume be provided with either bottled water or a carbon filter unit, but the Ramseys were not thought to be within the plume.

ConRail and Penn Central quibble over the possible years of exposure, which Dr. Haitjema set at 1983 to 1998 (the Ramseys apparently began to use city water in 1995), but that dispute doesn't affect either the motion to strike Dr. Haitjema's testimony or the summary judgment motion.

ConRail and Penn Central report that the "hot spot" to which Dr. Haitjema referred was three houses south of the Ramseys' home, about 200 feet away.

ConRail and Penn Central say Dr. Haitjema theorized that TCE had migrated to the Ramseys' well, and when the objective evidence (the "non-detect" readings at the Ramsey well and the next two wells to the south) didn't support his theory, he rejected the objective evidence rather than questioning his hypothesis. Even under Dr. Haitjema's hypothesis, ConRail and Penn Central argue, it cannot be determined how much TCE might have been in the Ramsey well, or how long it might have been there. Dr. Haitjema conceded in his deposition that the lack of objective data prevents him from identifying the path VOCs could be thought to have taken

from a particular source point the rail yard to the Ramseys' well.

ConRail and Penn Central offer the report of their own expert, engineer John Weaver, who opines that the predictions drawn from Dr. Haitjema's modeling are rendered unreliable by Dr. Haitjema's simplifying assumptions and inadequate calibration of the model. Further, Mr. Weaver says, the model doesn't really provide useful information because the sources and flow of the contaminants is already known—it was developed through the EPA's testing.

In sum, ConRail and Penn Central say the only thing to back up Dr. Haitjema's opinion is his own expertise, which is no longer sufficient for admissibility of expert opinion in federal trials.

The Ramseys, armed with a supplemental report by Dr. Haitjema, respond with several points. First, they argue that the only point scientifically proven by the "non-detect" readings is that the well water wasn't contaminated on the days of testing; a conclusion that it was contaminated on other days has no less scientific basis than a conclusion that it was never contaminated. Dr. Haitjema explains that when the Ramseys retained him to prepare an opinion in this case, he went beyond the existing data—the data on which Mr. Weaver relied—by conducting a series of additional groundwater modeling exercises. He says his methodology is well accepted in the field, and that other modeling studies (including one done for ConRail) support his conclusions about the general directions of groundwater movement. He also vigorously defends the simplicity of his model.

Most importantly (as the court sees it), Dr. Haitjema addresses the apparent discrepancy between what he expected the Ramsey well tests to show and the actual test results: he reports that in nearly every case in which he has been involved, "discrepancies" have been found between expected pathways of contaminants and data from wells: "non-detects" or low lev-

els of contaminants may be found in wells inside the plume, and high contaminant levels may be found outside the plume. Given its importance to the court's decision, the court sets forth this portion of Dr. Haitjema's supplemental report in its entirety:

What complicates matters is that groundwater contamination does not exhibit a true "plume" like nature. Contaminants move along different groundwater pathways at different rates and at different times. The contaminants along parallel paths hardly mix. If they did, groundwater quality monitoring would provide a more predictable picture of the distribution of contaminants in the subsurface. As it stands, however, we are getting somewhat random snapshots of contaminant occurrences from our monitoring wells. An understanding of this issue has grown slowly in the scientific community, but may not be common to all professionals in the field. John A. Cherry presented a relevant paper on this subject (co-author of the most frequently used textbook in groundwater hydrology: "Groundwater" by Freeze and Cherry). In his paper "Groundwater Monitoring: Some Deficiencies and Opportunities" (Proceedings of the 10th ORNL Life Sciences Symposium, Gatlinburg, Tennessee, May 21–24, 1990 Lewis Publishers, B.A. Berven & R.B. Gammage, Editors) Cherry addresses this problem. I quote *"research findings of the last decade on dispersion have immense implications for groundwater monitoring"*. Dr. Cherry cites research during the eighties, which show that transverse dispersion is a very weak effect (in sand and gravel aquifers), which implies that mixing is nearly absent. He writes:

*"Many plumes are heterogeneous in concentration distribution at the source because of spatially and temporally variable inputs of contamination, and complex site geology"[.] Because of weak dispersion the degree*

*of concentration heterogeneity diminishes very little down gradient, requiring a more dense monitoring network. In some plumes, the difference between detecting or missing a concentration zone orders of magnitude above a regulatory limit is difference in positioning in depth of the critical well by only a meter or two.*

For many years scientist have conducted so-called tracer tests in aquifers. Such a test comprises the controlled release of a chemical into the groundwater and an intense monitoring program to determine the resulting "plume". Naymik and Sievers (*Ground Water* volume 23, no 6, 1985) write in their discussion section of "Characterization of Dye Tracer Plumes: In Situ Field Experimentation":

*The velocity, shape, and position of the plumes in this sand and gravel aquifer were affected by both the geologic and hydrologic conditions at the site. The constantly changing hydraulic gradient and direction of flow as well as heterogeneities probably caused the plume to change directions and to spread laterally and appear flattened as they migrated. Plume geometry at a distance of 10 ft from the source was somewhat anticipated but had become grossly unpredictable at a distance of 50 ft.*

The authors were not capable of predicting a plume of a completely known source over a distance of only 50 ft. Near the Conrail yard we are dealing with multiple sources of unknown timing and location which occurred over a time period of many decades. The distance of travel to the plaintiffs well far exceeds the 50 feet mentioned in the article. Average groundwater pathlines, consistently show that water that moves initially in the (mapped) CR 1 plume area break away to the north across, among others, the Ramsey property.

Bear and Verruijt (on pages 17—21 in their earlier cited book) discuss the concept of a "Representative Elementary Volume" (REV). The concept of a REV is that a sufficiently large volume of the aquifer must be sampled (water in that volume mixed) to obtain the continuum of contaminant concentrations that would be consistent with the concept of a contaminant plume. For the case of groundwater contamination that volume, the REV, is usually very large, much larger than the volume of a water sample collected from a domestic well. Consequently, our well water samples tend to show variations in results spatially and temporally. For instance, a well a few houses south of the Ramsey residence showed high concentrations in the late eighties, non-detect in 1992 and again high concentrations in 1994 (quarterly well analyses submitted to EPA). This insight in the true nature of groundwater contamination, the results of my groundwater flow modeling exercises and my understanding of the nature of the contaminant history on the Conrail yard form the "scientific foundation" for my findings.

The Ramseys also note that IDEM earlier retained Dr. Haitjema and a Ph.D. student under his direction to study the rail yard contamination, and Dr. Haitjema and the student used the same groundwater modeling program thàt Dr. Haitjema used in reaching the opinions challenged today. Dr. Haitjema alerted IDEM at the time of that study that his modeling suggested (rightly as it turned out) additional contaminant sources on the rail yard. Well sampling showed that the groundwater flowed north and northwest of the rail yard, as Dr. Haitjema and other consultants had predicted. The Ramseys report that Dr. Haitjema presented his groundwater modeling approach at a 1998 American Geophysical Union meeting, and two scientists praised the flow modeling. The Ramseys explain, with citations to Dr. Haitjema's deposition (the court doesn't read those portions of the depositions the way the Ramseys do), that all wells in the

area, including the Ramseys' well, essentially pick up contaminants because of the intensity of the pollution in the area. The Ramseys explain that the ground water levels fluctuate with stages of the river.

The issue before the court isn't whether Dr. Haitjema's analysis is more probably correct than incorrect—the Ramseys are entitled to have that issue decided by a jury rather than by a judge—but rather whether the opinion testimony that encompasses his analysis is admissible into evidence. Federal Rule of Evidence 702, which governs the admissibility of expert testimony in federal courts, "establishes two admissibility requirements for expert testimony: (1) the expert must be qualified, and (2) the subject matter of the expert's testimony must consist of specialized knowledge that will be helpful or essential to the trier of fact in deciding the case." *United States v. Lanzotti,* 205 F.3d 951, 956 (7th Cir.2000) (citing *Buscaglia v. United States,* 25 F.3d 530, 533 (7th Cir. 1994); *United States v. Stevenson,* 6 F.3d 1262, 1266 (7th Cir.1993); FED. R. EVID. 702). As noted before, Dr. Haitjema's qualifications are not in question (and neither, for that matter, are Dr. Bratbaur's).

■■■ Admissibility of Dr. Haitjema's testimony centers around the reliability of his methodology and the relevance of his opinions. Rule 702 requires more than a subjective belief or unsupported speculation; a district court must act as a "gatekeeper" to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589–590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The first prong of the two-step inquiry, reliability, focuses on the methodology used by the expert. *Clark v. Takata Corp.,* 192 F.3d 750, 756 (7th Cir.1999). The expert must substantiate his or her opinion, and not simply provide an ultimate conclusion without analysis. *Id.* at 758. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which

is connected to existing data only by the ipse dixit of the expert." *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Either hands-on testing or review of experimental, statistical, or other scientific data gathered by others may suffice as a reasonable methodology upon which to base an opinion. *Clark v. Takata Corp.,* 192 F.3d at 758 (citing *Cummins v. Lyle Indus.,* 93 F.3d 362, 369 (7th Cir.1996)).

The second prong focuses on the testimony's relevance: the court inquires whether the testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. *Walker v. Soo Line R. Co.,* 208 F.3d 581, 587 (7th Cir. 2000); *Clark v. Takata Corp.,* 192 F.3d at 756. The court must ask whether the reasoning or methodology in question can be applied properly to the facts in issue. *Daubert v. Merrell Dow,* 509 U.S. at 593, 113 S.Ct. 2786. The inquiry as to the reliability and relevance of the testimony is "a flexible one" designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■■ The *Daubert* court offered factors for consideration, on a case-by-case basis, to illuminate whether a proffered methodology is reliable enough: whether the methodology can be tested; whether it has been subject to peer review; what the known or potential rate of error is and whether there are standards controlling the technique's operation; and whether there is general acceptance of the technique in the relevant scientific community. *Daubert v. Merrell Dow,* 509 U.S. at 594, 113 S.Ct. 2786.

Much of Dr. Haitjema's methodology passes the *Daubert* inquiry with flying colors, but the record identifies no scientific

principle on which Dr. Haitjema based the critical last step of his analysis—that the uniform "non-detect" results of well testing, not only of the Ramseys' well but also wells to the south, don't affect the conclusion that TCE, CC1$_4$ and breakdown products from those VOCs from the rail yard entered the Ramseys' drinking water.

The Ramseys say the accuracy of Dr. Haitjema's groundwater flow model has been tested in the sense that Dr. Haitjema's groundwater flow patterns are similar to those of another consultant that the Environmental Protection Agency hired to investigate possible contamination near the railyard. The Ramseys also say well water analyses generally support Dr. Haitjema's conclusion. These points may be more aptly considered with respect to general acceptance in the field of hydrology, but the court accepts that Dr. Haitjema's flow model has as much accuracy as anything else in contemporary hydrology as a predictor of the general direction of groundwater flow. Mr. Weaver seems to argue in his report that predicting the migration of contaminants that are heavier than water entails scientific considerations beyond simple groundwater flow. The court doesn't understand Conrail and Penn Central to have made such an argument in its brief, though; had they done so, the Ramseys might have responded (as they would have had to) with something beyond Dr. Haitjema's supplemental affidavit. See *Ecolab, Inc. v. Amerikem Laboratories, Inc.,* 98 F.Supp.2d 569, 577 n. 18 (D.N.J.2000) ("the [*Kuhmo* ] Court noted that the Federal Rules of Evidence do not require trial courts to admit opinion evidence when the expert alone attests that the method is reliable.").

In any event, use of the groundwater flow model as a comparatively accurate predictor of the general direction of VOC migration doesn't support a finding of reliability when the model is used to support an opinion that VOCs traveled from one point (anywhere on the rail yard) to a specific second point (the Ramseys' well) despite lack of support in years of actual testing.

There is no known error rate for Dr. Haitjema's modeling technique. His modeling technique has at least some potential to be tested: accuracy is proven if wells located in the area expected to be contaminated produce contaminants of the sort released at the rail yard. The converse is not necessarily true: Dr Haitjema is correct when he says that the well tests at the Ramsey home don't conclusively disprove the presence of TCE on occasions other than the times of testing; the non-positives do not foreclose the possibility that TCE was in groundwater at other times. But this argument cuts against a finding of reliability because it suggests that Dr Haitjema's methodology is essentially untestable by any method other than continual well monitoring.

Further, the critical link to the Ramseys' causal chain isn't simply that Dr. Haitjema is right (and the others wrong) about whether TCE or CC1$_4$ from the rail yard reached the Ramsey property—the point to which the other references in Dr. Haitjema's supplemental report seem pertinent—but rather whether those substances reached the well from which Amanda Ramsey's drinking water was taken. That water was tested, as was water from the wells to the south of her well— twelve tests in all, over the course of eight years—and none of those tests detected such substances.

The court struggles to avoid the superficially logical conclusion that those substances would have been detected in at least one of those twelve tests had they reached the Ramsey well: the law of evidence allows scientists to give expert testimony in court precisely because what science knows to be true is not always intuitive, and may even appear illogical to the non-scientist. Still, it seems that reliable methodology would, as suggested by Mr. Weaver's report, involve further examination after some number of tests revealed no VOCs. The requisite number of

negative tests might be greater than one or two, or perhaps even greater than twelve, but this record provides no basis for the court to find that methodology based on reliable principles simply allows all twelve tests to be discounted in their entirety.

Many cases decided under *Daubert* have excluded opinion testimony from experts who ignored facts or considerations that must be considered under methods based on reliable principles. See, e.g., *United States v. Crotteau*, 218 F.3d 826, 833 (7th Cir.2000); *Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Conn.*, 98 F.Supp.2d 729 (W.D.Va.2000). Dr. Haitjema didn't ignore the non-detect tests. He explained why those tests didn't prove that TCE never reached the Ramsey well. But the record contains no explanation as to how any scientific principles support the contrary opinion in the face of eight years of non-detect results in and immediately around the Ramsey well.

■ Dr. Haitjema's opinion testimony is not admissible under today's understanding of Federal Rule of Evidence 702, and the court grants the defendants' motion to strike it.

A motion for summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, "a trial court must view the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party." To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." However, neither presenting a scintilla of evidence, nor the mere existence of some alleged factual dispute between the parties or some metaphysical doubt as to the material facts, is sufficient to oppose a motion for summary judgment. The party must supply evidence sufficient to allow a jury to render a verdict in his favor.

*Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1087–1088 (7th Cir.2000).

■ Exposure to toxic chemicals is a necessary element of plaintiff' claim. "Under Indiana law, the claimant must prove every element of a prima facie case, including causation." *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607, 612 (7th Cir. 1993). The paths of contaminants as they leech though underground aquifers it not within the purview of laypersons' understanding, and requires expert testimony to explain. Even considering all other facts in the light most favorable to the plaintiff, the loss of Dr. Haitjema's testimony leaves the plaintiffs unable to establish a causal link between the Conrail railyard and Amanda Ramsey's illness.

Dr. Brautbar would testify that Amanda Ramsey was exposed to TCE, $CCl_4$ and their breakdown products, but any link he might offer to the rail yard is based on Dr. Haitjema's opinion. Rule 703 allows an expert to base an opinion on reports of others without regard to the reports' admissibility as long as others in the experts' field reasonably rely on such reports. The court doesn't understand Dr. Brautbar to assert that other physicians reasonably rely on opinions of hydrologists that are not based on reliable scientific principles. The court grants the defendants' motion to strike Dr. Brautbar's opinion (only because it is based on what the court has found to be unreliable; the remaining issues raised in the motion to strike needn't be addressed) and the defendants' joint motion for summary judgment. This ruling renders the remaining motions in the case moot.

For the reasons set forth above, the court GRANTS defendants' joint motion to exclude the expert testimony of Dr. Haitjema [Docket No. 92]; GRANTS defendants' joint motion for summary judgment [Dock-

et No. 88]; GRANTS the defendants' joint motion to exclude the testimony of Dr. Brautbar [Docket No. 89]; DENIES AS MOOT defendants' joint motion to strike the Record of Decision and the deposition outlines of Dr Haitjema and Dr. Brautbar [Docket No. 97]; and DENIES AS MOOT the defendants' motion to strike and expunge [Docket No. 106]. Finally, the court DENIES AS MOOT all motions filed (whether docketed or not as of the time of this order) after the defendants' motion to strike and expunge.

SO ORDERED.