# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-3638

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ANDRE WELCH,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 818—**Blanche M. Manning**, *Judge.*

———————

ARGUED APRIL 15, 2004—DECIDED May 27, 2004

———————

Before FLAUM, *Chief Judge*, and MANION and ROVNER,
*Circuit Judges*.

FLAUM, *Chief Judge*. Andre Welch was convicted of the
robbery of Illiana Federal Credit Union on February 28,
2003. He now appeals his conviction and argues that the
district court abused its discretion by excluding expert
testimony regarding the possible inaccuracy of eyewitness
identifications. For the reasons stated herein, we affirm.

## I. BACKGROUND

On August 21, 1997 at approximately 11:20 a.m., there
was a bank robbery at the Illiana Federal Credit Union in

Calumet City, Illinois. According to the bank teller, the robber approached her teller window and gave her a note instructing her not to make a sound or set off any alarms and to put all of the money into a bag. The robber placed a blue vinyl bag onto the counter in front of the window, and the teller saw that the bag had a brown handle sticking out of it that appeared to be the handle of a gun. Upon seeing what she believed to be a gun, the teller complied with the robber's instructions and filled a bag with money. The robber then grabbed the bag as well as his own blue vinyl bag and ran out of the bank.

Throughout this experience the bank teller was extremely frightened and upset. She estimates that she saw the robber for only thirty seconds and that her powers of observation were negatively affected due to her heightened emotional state. Still, the teller did give a general description of the robber as being an African-American male between 5'10" and 6' tall and 160-180 pounds. The teller also noted that the robber was wearing a long-sleeve button-down blue denim shirt with a t-shirt underneath, denim jeans, a dark-colored baseball cap, and sunglasses. Additionally, the teller viewed the bank surveillance videotape after the robbery and positively identified the individual on the tape as the robber.

This identification was corroborated by a bank customer who waited in line directly behind the robber for five minutes. Although the customer never got a good look at the robber's face, he described him as an African-American male approximately 5'10" or 5'11" tall, weighing between 170-180 pounds, and wearing blue jeans, a denim shirt, a hat, and sunglasses. The customer also viewed the bank's surveillance videotape and confirmed that the man depicted on the tape was the robber.

Nearly five years later, on August 20, 2002, Andre Welch was indicted and charged with one count of robbing the

Illiana Federal Credit Union. Welch was not linked to the crime by any fingerprints, nor was he identified in a line-up that he had participated in on September 8, 1997 where the bank teller made a tentative identification of another individual. However, Welch did match the general description given by the bank teller and bank customer. Namely, Welch is an African-American male and at the time of the crime he was 5'10" or 5'11" tall and weighed 165-175 pounds. Moreover, a search of Welch's house uncovered an air gun with a brown handle similar to the gun the teller saw, as well as a family photograph where Welch was wearing a baseball hat and sunglasses similar to those worn by the bank robber.

Welch was also linked to the bank robbery by three individuals who knew Welch and believed that he was the person depicted in the bank surveillance videotapes. The first of these individuals was Steven Austin, Welch's former roommate and co-worker. In August 1997, Austin had known Welch for a year and a half and had lived with him for a few months. When asked after the robbery if he recognized the person depicted in the bank's surveillance videotape, Austin stated that he had no doubt that the robber was Andre Welch. He recognized the sunglasses the robber was wearing as similar to those worn by Welch, and examined the face in the photograph carefully to determine that it was indeed Welch depicted in the picture.

The second person who recognized Welch as the man in the bank surveillance videotape was Lorraine Cook. Cook worked with Welch every day for two or three weeks in August 1997. According to Cook, Welch typically wore jeans and a button-down shirt with a t-shirt underneath to work. When shown the surveillance videotape from the bank, Cook stated that she had no doubts that the robber was Welch. First, Cook recognized the clothing as similar to clothing usually worn by Welch. Also, Cook found the

posture of the bank robber to be the same as Welch's posture when he had been standing for a long period of time.

Welch's ex-wife, Judith Welch, also recognized the man in the bank photographs as Andre Welch. Judith and Andre Welch were married for twelve years and lived together for eleven years. They had three children together, but separated in 1996 after Judith discovered that Andre Welch was having an extramarital affair. When Judith was shown the bank surveillance tapes, she testified that she was completely certain that Andre Welch was the robber. Judith testified that the shirt worn by the robber looked exactly like a shirt she had purchased for Andre Welch when they were married. She also identified the sunglasses as sunglasses that Andre Welch wore in May 1997 when the two met at a train station. Furthermore, Judith believed that the running shoes worn by the robber were those that Andre Welch typically wore. Finally, when asked what particularly about the photographs made her believe it was Andre Welch, Judith replied, "[w]hen I looked at the photographs, I just did not pick out one specific thing. I recognized the individual. I know his features, I know what he looks like."

Prior to Welch's trial, Welch filed a "Notice of Expert Testimony Concerning Eyewitness Identification and Human Memory and Perception." Welch argued that Dr. Otto Maclin, a psychologist in the field of witness identifications, memory, and perception, should be allowed to testify for the defense regarding witnesses' propensity to identify a defendant based upon their familiarity with the defendant's clothes (known as "clothing bias") and witnesses' tendencies to misidentify defendants based upon factors of which the witness is not aware. The expert also would have testified that memory diminishes over time rather than improves over time. In response, the government moved *in limine* to exclude the expert's proposed testimony, arguing that it would not assist the jury in this

case. The district court agreed with the government and excluded Dr. Maclin's testimony.

At trial, the government presented the testimony of Steven Austin, Lorraine Cook, and Judith Welch. In addition to identifying Andre Welch in the bank photographs, Austin also testified that Welch had made incriminating statements regarding bank robbery. Specifically, the week prior to the bank robbery, Welch asked Austin if he was interested in making extra money. When Austin replied that he was, Welch said, "If I tell you, I'll have to kill you." Later that day, Austin again asked the defendant how to make extra money, and the defendant replied, "banks." Austin knew that Welch did not work at a bank and had never been employed as a banker. The government also provided evidence at trial that during the week of August 17, 1997, Welch normally worked the 7 a.m. to 3 p.m. shift, but on the day of the robbery Welch did not arrive at work until 2 p.m. It was a thirteen-minute drive from Illiana Federal Credit Union to Welch's workplace. Based upon this evidence, Welch was found guilty of the bank robbery of Illiana Federal Credit Union at the conclusion of a three-day jury trial.

## II. DISCUSSION

Welch's sole argument on appeal is that the district court erred by excluding Dr. Maclin's testimony on eyewitness identification and human memory and perception. Given that both parties agree that the district court properly followed the framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), we review the district court's decision to exclude the testimony for an abuse of discretion. *See United States v. Crotteau*, 218 F.3d 826, 831 (7th Cir. 2000). In attempting to show that the district court did abuse its discretion, Welch faces an uphill battle against the long line of Seventh Circuit cases holding

that district courts did not commit abuses of discretion by excluding expert testimony regarding the reliability of eyewitness identifications. *See, e.g.*, *Crotteau*, 218 F.3d at 833; *United States v. Hall*, 165 F.3d 1095, 1105 (7th Cir. 1999); *United States v. Daniels*, 64 F.3d 311, 315 (7th Cir. 1995); *United States v. Larkin*, 978 F.2d 964, 971 (7th Cir. 1992); *United States v. Curry*, 977 F.2d 1042, 1052 (7th Cir. 1992). These cases reflect the great deference that this Court grants to district courts, which have "first-hand exposure to the witnesses and the evidence as a whole" and therefore have the "ability to gauge the impact of the evidence in the context of the entire proceeding." *Crotteau*, 218 F.3d at 831.

The admissibility of expert scientific testimony is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 589-92. *Daubert* established a two-part test for district courts, which must determine first whether the proposed expert's testimony reflects valid "scientific knowledge," and if so, whether this testimony "will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. In this case, both parties agree that Dr. Maclin utilized reasoning and methodology that was scientifically valid. The only disputed issue is thus whether this information would have been of assistance to the jury.

Welch contends that an expert witness on eyewitness identification would have assisted the jury because the government's case depended almost exclusively on eyewitness identifications and Dr. Maclin would have testified that none of these identifications were as credible as they seemed to be. For example, Judith Welch testified that she recognized Andre Welch in the photograph based in part on the clothes he was wearing. In response, Dr. Maclin would have explained to the jury the theory known as "clothing bias" which posits that the possibility of misidentification from photographs increases when the person making the identification believes that she recognizes an article of

clothing worn by the person in the photograph. Additionally, although Steven Austin examined the face of the bank robber closely to determine if it was Welch, Dr. Maclin would have explained that misidentification can occur when the witness views someone structurally similar to someone the witness knows. Finally, Lorraine Cook testified at trial that she was certain that Welch was the robber, but on cross-examination Cook agreed that when the FBI first approached her five years before the trial, she merely stated that she believed Welch was the robber. Dr. Maclin would have attacked Cook's credibility with testimony regarding how human memory generally diminishes over time rather than improves over time.

We are not persuaded by Welch's arguments that the proposed testimony would have assisted the jury in this case. As Welch acknowledges, expert testimony is helpful to the jury if it concerns a matter beyond the understanding of the average person, assists the jury in understanding facts at issue, or puts the facts in context. *See* Fed. R. Evid. 702; *United States v. Mansoori*, 304 F.3d 635, 653-54 (7th Cir. 2002). We do not believe that Dr. Maclin's proposed testimony fits into any of these categories. Although the average person may not know what the term "clothing bias" means, it is common knowledge that one may mistake a person for someone else who is similarly dressed. Moreover, the typical juror would know that two people who are structurally similar are more likely to be confused for each other than are dissimilar individuals. Finally, it does not require an expert witness to point out that memory decreases over time. Where expert testimony "addresses an issue of which the jury is already generally . . . aware," such testimony does not assist the jury. *Hall*, 165 F.3d at 1104.

Even if this type of information would be enlightening to an average jury, Welch did not demonstrate a proper "fit" between the proposed testimony and the eyewitness identifications in this particular case. Unlike most eyewit-

nesses, the eyewitnesses in this case knew the defendant very well prior to the crime. Additionally, these eyewitnesses had ample opportunity to view the bank surveillance photographs for as much time as they needed while in a stress-free environment. However, Welch's motion to utilize Dr. Maclin's testimony was not specific to this category of eyewitness identification. Without a better link to the facts of the case, it was well within the district court's discretion to exclude general assertions about clothing bias and common mistakes made by eyewitnesses.

As we did in *United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999), we further support our conclusion that the district court did not abuse its discretion by looking at other factors surrounding the evidence regarding eyewitness identification. In *Hall*, this Court identified three "additional considerations" for appellate review when determining whether a district court abused its discretion. These three considerations were whether: (1) the defense had an opportunity to thoroughly cross-examine all of the eyewitnesses; (2) the district court gave the jury an instruction on the reliability of eyewitness identification; and (3) substantial corroborating evidence implicated the defendant as the perpetrator of the crime. *See id.* Like in *Hall*, the defense in this case had an opportunity to throughly cross-examine all of the eyewitnesses. In fact, Welch's counsel took full advantage of this opportunity by extensively cross-examining Steven Austin, Lorraine Cook, and Judith Welch regarding how well they knew Welch, why they became more certain of their identifications either over time or after they were granted immunity from prosecution, and the fact that the clothes worn by the bank robber were not unique. In addition to the cross-examinations, the jury also was given cautionary instructions regarding the credibility of witnesses and identification testimony. And while the corroborating evidence in this case was not as substantial as the defendant's confession in *Hall*, *id.* at 1108, we note

that the jury was able to observe Welch's appearance and demeanor at trial and compare it to the surveillance photographs and videotape themselves. The jury therefore had an excellent opportunity to determine personally whether they believed the eyewitness testimony that Welch was the individual depicted in the bank's surveillance videotapes.

This is not to say that similar testimony would never be helpful to a jury, or that it would have been an abuse of discretion for the district court to allow Dr. Maclin's testimony. But based upon the facts of this case, where the identification witnesses knew the defendant for a substantial period of time prior to viewing the photographs and videotape and had as much time as they needed to analyze the photographs and videotape, it was certainly not an abuse of discretion for the district court to exclude the testimony and instead allow extensive cross-examination and jury instructions regarding the possible inaccuracies that accompany eyewitness identifications.

This case is distinguishable from *United States v. Alexander*, 816 F.2d 164, 168-69 (5th Cir. 1987), where the Fifth Circuit found reversible error when the district court excluded expert testimony about photographic comparisons. Although the contextual facts are similar—in *Alexander*, the only evidence linking the defendant to the crime was the testimony of eyewitnesses who compared the defendant's photograph to crime scene photographs— the proposed expert testimony is significantly different. Specifically, Alexander wanted to present the testimony of one expert witness who was an orthodontist specializing in cephalometrics (the scientific measurement of dimensions of the head) and another expert witness who was an agent with the Federal Bureau of Investigation with expertise in photographic comparisons. *Id.* at 167. Both experts would have testified that it was impossible for the defendant to be the person in the crime scene photographs. *Id.* The Fifth

Circuit determined that these witnesses would have assisted the jury because they would have been able to show the jury "claimed specific differences in . . . facial features which were revealed as a result of . . . scientific analysis of the photographs." *Id.* This is the type of comparison that cannot be made without expert assistance. *Id.*

The expert testimony proposed by Welch, however, was not direct evidence regarding whether he committed the crime. Dr. Maclin would not have offered any opinion on whether Welch was actually portrayed in the bank's surveillance photographs. Rather, Dr. Maclin's only purpose was to question the credibility of the witnesses who believed that Welch was depicted in the photographs. As this Court has often stated, determining the credibility of witnesses is one of the jury's critical functions and is "generally not an appropriate subject matter for expert testimony." *Hall*, 165 F.3d at 1107. We therefore conclude that the district court acted properly by excluding Dr. Maclin's testimony.

## III. CONCLUSION

We emphasize that expert testimony regarding eyewitness identification, memory, and perception is not per se unhelpful. However, the usefulness of such evidence in a particular case is best decided by the district court and given great deference by this Court. For the foregoing reasons, the decision of the district court is AFFIRMED.

A true Copy:

     Teste:

                            _____

                        *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*