# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2008

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDDIE R. CARTER,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of  Illinois, Eastern Division.
No. 01 CR 783—**Charles R. Norgle**, **Sr.**, *Judge.*

———————

ARGUED APRIL 7, 2005—DECIDED JUNE 10, 2005

———————

Before MANION, ROVNER, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.*  A jury convicted Eddie Carter on
two counts of bank robbery, 18 U.S.C. § 2113(a), and one
count of brandishing a firearm in the commission of a bank
robbery, 18 U.S.C. § 924(c)(1)(A)(ii). The district court sen-
tenced Carter to 272 months of imprisonment. On appeal,
Carter challenges three trial-related rulings by the district
court as well as the sufficiency of the evidence against him
on one of the bank robbery counts. Carter also appeals his
sentence on each of the bank robbery counts. We affirm the
conviction in all respects. As to the sentence, we order a

limited remand in accordance with *United States v. Paladino,* 401 F.3d 471 (7th Cir. 2005).

### I.

Two similar bank robberies are at the heart of this criminal case. The robber's identity and whether the same individual perpetrated each robbery were the central factual disputes at trial.

The first robbery occurred on September 1, 2001. A man entered the Firstar Bank located at 3610 North Kedzie Avenue in Chicago, Illinois. Seemingly upset about the length of the teller line, the man loudly and profanely complained about the wait. He then impatiently left the bank without transacting any business. Minutes later, the same man returned, pulling out a gun and ordering everyone to the floor. One astonished bank teller named Daniel Hernandez did not comply. Hernandez stood staring at the bank robber, who then pointed his gun directly at Hernandez and walked toward Hernandez. The robber then directly told Hernandez to get down. This time, Hernandez complied. The robber then jumped on and over the teller counter. Once over, the robber instructed Hernandez to open his two teller drawers. The robber then stole $2,884 from the drawers, hurdled back over the counter, and bolted out of the bank.

Outside the bank, Arsalan Syed witnessed a man dropping cash as the man raced out of the bank. Syed then observed the man hurry into a nearby car and speed away. Suspicious, Syed noted the car's license plate number and gave it to the police. Law enforcement officials did not immediately ascertain the identity of the bank robber.

The second robbery occurred on September 4, 2001. A man entered the First American Bank located at 2001 North

Mannheim Road in Melrose Park, Illinois. He drew attention to himself by loudly asking for directions. After a customer gave him directions, he left the bank without transacting any business. About an hour later, the same man returned, attempting to disguise himself with a baseball cap and dark sunglasses. Carrying a black bag, he waited in the teller line, and, after reaching the front of the line, he approached a bank teller named Jennifer Velazquez. He told her that he wanted to make a withdrawal, pulled a gun out of his bag, pointed it at her, and said, "This is an old-fashioned holdup. Give me $10,000."

Velazquez did as the bank robber instructed. As she began withdrawing bundles of $20 bills, the robber turned toward the bank's customers and, while waving his gun, ordered everyone down. The bundles were marked with the bank's name, a branch number, and Velazquez's teller number. After Velazquez had placed the money into his bag, the robber demanded additional money from the adjacent teller's drawer. Unable to open the drawer herself, Velazquez proceeded to locate the other teller, Rosa Martinez, who was hiding in the vault in the back of the bank. Having climbed over the teller counter, the robber went into the vault. He pointed his gun directly at Martinez and forced her to move from the vault out into the teller area to open her drawer. After Martinez opened her drawer and gave the robber its contents, the robber leaped back over the counter and left the bank with $13,634.

Outside, the robber entered a car near the bank. As the robber fled the scene, the bank's manager, Manal Ramadan, reported the robbery to a police dispatcher. Ramadan described the robber and the getaway car. Not far from the bank, the police soon identified a car matching Ramadan's description of the getaway car. After the matching car had failed to stop at a red light, the police attempted

to pull the car over, but a chase ensued. The car eventually smashed into a police barricade. The suspect attempted to flee on foot, but the police apprehended him within feet of the wreck.

At the crash scene, the police found a black bag full of money and two guns along with a cap and sunglasses matching the ones worn by the robber in the bank. The police took the suspect to a police station for questioning by FBI agents. There, the suspect—determined to be Eddie Carter—confessed to the robbery that had just occurred (September 4). In addition, Velazquez later identified Carter as the September 4 robber. Testing also revealed that shoe prints left by the robber on the teller counter matched the size, make, and model of the shoes that Carter was wearing at the time of his arrest.

Carter quickly became the FBI's prime suspect in the September 1 robbery. As with the September 4 robbery, shoe prints left by the robber jumping on and over the teller counter during the September 1 robbery matched the size, make, and model of the shoes that Carter was wearing at the time of his arrest. The FBI also determined that the license plate number on the September 1 getaway car matched a car owned by Carter's half-brother. Carter was in possession of that car from August 30 to September 3, 2001. Upon locating the car in question, the FBI discovered a crumpled piece of paper with the handwritten words, "Relax. This is a stick-up. Don't do nothing." Further, the police found a "crack pipe" at the scene of the September 1 bank robbery. Laboratory analysis determined that DNA from saliva on the pipe matched Carter's DNA.

Additionally, the FBI asked Hernandez, an eyewitness to the September 1 robbery, to review a six-man photo array to identify the robber. This review took place on September 6, 2001, just days after the robbery. Hernandez did not iden-

tify the robber for the FBI at that juncture. On December 5, 2001, the FBI asked Hernandez to review a different six-man photo array. This time, Hernandez immediately identified Carter as the robber. He also indicated that he had identified Carter at the first showing but, in the wake of the traumatic robbery, he did not say so due to his fear of Carter.

Carter was charged with both robberies, and he went to trial on three counts. Count one charged Carter with bank robbery under 18 U.S.C. § 2113(a) and pertained to the September 1 robbery. Count two also charged Carter with bank robbery under § 2113(a) and concerned the September 4 robbery. Finally, count three charged Carter, pursuant to 18 U.S.C. § 924(c)(1)(A)(ii), with brandishing a firearm during the September 4 robbery.

With respect to count one, Hernandez's identification of Carter as the September 1 robber was a key piece of the evidence supporting the government's case, and Carter attempted to nullify the identification in two ways. Carter first moved to suppress the identification as unreliable. Carter alternatively moved for the appointment of a memory expert to explain to the jury how Hernandez could have misidentified Carter. The district court denied each motion.

At trial, Carter testified in his own defense. His direct testimony was in narrative form, as opposed to questions and answers. When his narrative strayed into religious and philosophical observations, the government objected, and the district court instructed Carter to stick to matters relevant to the trial. After seven such warnings went unheeded, the district court limited Carter's testimony. According to Carter, the district court cut him off before he testified about the September 1 robbery.

The jury convicted Carter on each count. The district court, under the mandatory sentencing guidelines, imposed

several enhancements based upon judge-found facts and sentenced Carter to 188 months on counts one and two, to be served concurrently. On count three, the district court sentenced Carter to 84 months, to be served consecutive to the other sentences. The result was a total imprisonment term of 272 months.

Carter appeals the district court's denial of his motion to suppress Hernandez's identification, the denial of his motion for an expert witness, and the limitation of his testimony. Further, with respect to count one, Carter challenges the sufficiency of the evidence against him. He also appeals his sentence on counts one and two; besides arguing that the district court erred in applying certain enhancements, Carter raises a Sixth Amendment challenge under *United States v. Booker*, 125 S. Ct. 738 (2005). We will address each argument in turn.

## II.

### A. Eyewitness Identification

Carter first argues that the district court should have suppressed Hernandez's identification of Carter as the September 1 bank robber. There are two aspects to this argument. Carter first contends that the photo array shown to Hernandez on September 6 was impermissibly suggestive as it unfairly attracted attention to Carter's photo. Carter then maintains that the faulty September 6 array infected the entire identification procedure and that, as a consequence, Hernandez's identification of Carter from the array of photos presented on December 5 was unreliable. Carter therefore argues that the admission of Hernandez's identification deprived him of a fair trial.

Review is de novo "with due deference to the [district] court's findings of historical fact." *United States v. Harris*, 281

F.3d 667, 670 (7th Cir. 2002). The test for determining the admissibility of such identifications has two steps. First, the defendant must establish that the photo array was "unduly suggestive." *Id.* Second, if the first step is met, then the government must establish that the identification was nonetheless "reliable." *Id.*

Carter concedes that the December 5 photo array, standing alone, is not unduly suggestive. Rather, as indicated above, he argues that the unduly suggestive September 6 array contaminated the December 5 array. Each array contained six photos arranged in two equal rows. Six is a sufficient number of photos for such a line-up. *See United States v. Galati*, 230 F.3d 254, 260 (7th Cir. 2000); *United States v. Moore*, 115 F.3d 1348, 1360 (7th Cir. 1997); *United States v. Sleet*, 54 F.3d 303, 309 (7th Cir. 1995). Further, in each array, the photos were similar shots[1] of young, black men with similar facial hair and other similar features. *See Moore*, 115 F.3d at 1360; *Sleet*, 54 F.3d at 309.

While admitting these similarities exist, Carter nevertheless contends that the September 6 array unfairly attracts attention to his photo because his photo appears in the bottom-center position of the six photos and because Carter is wearing a white shirt in his photo. However, beyond his personal opinion and the array itself, Carter has not offered any support for his conclusions. Contrary to his belief, the array does not intrinsically prove his assertions. We thus have no reason to believe that any one of the six photo positions is more prominent than the other five or that a white shirt unfairly draws attention. Carter, furthermore, is

---

[1] In the September 6 array, each subject's chest and head are visible. In the December 5 array, each subject's neck and head are visible.

not the only subject wearing a white shirt. Moreover, if the bottom-center position is an inherently pronounced position as Carter argues, then every photo array with a suspect pictured in the bottom-center position could be held unduly suggestive. We see no basis for such a rule. All that said, Carter does point to an imperfection in the September 6 array. The background of two photos is dark gray while the background of the other four photos, including Carter's photo, is light gray. However, this difference does not make the array *unduly* suggestive in this case. The two dark-gray photos are not so dark as to make subjects unrecognizable, and, even if they were, four light-gray photos still remained. *See Harris*, 281 F.3d at 669-70 (finding a four-man photo array "reasonable"). Additionally, an argument can be made, contrary to Carter's contention, that the darker, but still-clear photos draw the viewer's eye away from Carter and to the subjects with the darker backgrounds. At bottom, Carter has not given us a concrete reason to believe that the light-gray shade of his photo's background—in isolation or in combination with his bottom-center and white-shirt arguments—unfairly drew attention to his photo. He has not met his burden. The September 6 array was not unduly suggestive.

Further, the September 6 array did not taint the December 5 array. Carter complains that, in the December 5 array, he was again placed in the bottom-center position and that he was the only individual shown in both arrays. Again, Carter makes these assertions without citation to any authority or any evidence beyond the array itself. Thus, as before, his placement in the bottom-center position does not tarnish the array. Moreover, just because Carter appeared in the same position twice does not change that fact when, as in this case, there is a substantial passage of time between showings, i.e., three months. Furthermore, as we have previously

concluded, "there is nothing per se impermissible about placing the same suspect in two different identification procedures" especially when there is a "substantial passage of time" between the two showings. *Id.* at 670-71 ("[A]fter such a substantial passage of time, it is unlikely that [the eyewitnesses] was influenced by the earlier photograph, let alone that it led to misidentification.") (six months). Carter has failed to show that the photo identification procedure in this case was unduly suggestive. The district court correctly admitted the identification at trial.

Although we need not address the second step, we briefly observe that the record demonstrates that the identification was reliable. Hernandez saw Carter twice at the bank. He first saw Carter when Carter made a scene about waiting in line (apparently casing the bank). He also saw Carter during the robbery, at which time Hernandez stared directly at Carter as Carter approached and spoke to him. Hernandez had more than a sufficient opportunity to view Carter and, for a period, had his attention squarely fixed on Carter. These important factors show that, under the totality of the circumstances, the identification was reliable. *See Moore*, 115 F.3d at 1360-61.

## B. Expert Witness

Carter further contends that the district court abused its discretion in denying his motion for the appointment of an expert regarding the reliability of Hernandez's eyewitness identification. Although Carter was financially eligible for such an appointment under 18 U.S.C. § 3006A(e)(1), the district court determined that the appointment was unnecessary because the expert testimony would be inadmissible under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. Specifically,

the district court held that the proposed testimony from Carter's requested expert, psychologist Geoffrey Loftus, would not aid the jury in its determination and, further, that any such testimony might actually confuse, mislead, or unduly influence the jury. Carter does not argue that the district court improperly applied the *Daubert* framework, and the government does not and did not challenge Loftus's qualifications; therefore, our review is only for abuse of discretion, and our focus is only on the usefulness of the testimony, i.e., whether it would actually assist the jury in understanding or determining a fact in issue. *See United States v. Hall*, 165 F.3d 1095, 1101-03 (7th Cir. 1999); Fed. R. Evid. 702; *see also United States v. Welch*, 368 F.3d 970, 973 (7th Cir. 2004); *United States v. Daniels*, 64 F.3d 311, 315 (7th Cir. 1995); Fed. R. Evid. 403.

Carter wanted Loftus to inform the jury that an eye-witness's memory can sometimes be inaccurate. Loftus planned to opine about factors that could affect memory, including the circumstances surrounding the event in question, the amount of stress on the eyewitness, the amount of attention paid by the witness, and the law enforcement procedures used to elicit the witness's memory. In general, however, jurors understand that memory can be less than perfect. *See Hall*, 165 F.3d at 1105 ("the hazards of eyewitness identification are 'well within the ken of most lay jurors'") (quoting *United States v. Larkin*, 978 F.2d 964, 971 (7th Cir. 1992)). Such awareness is even greater when potential problems in eyewitness identifications are brought to the jury's attention through cautionary instructions. *See United States v. Crotteau*, 218 F.3d 826, 832-33 (7th Cir. 2000). Furthermore, "the credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony because it influences a critical function of the jury—determining the credibility of witnesses." *Hall*, 165 F.3d at

1107. Consequently, there is a "long line of Seventh Circuit cases holding that district courts did not commit abuses of discretion by excluding expert testimony regarding the reliability of eyewitness identifications." *Welch*, 368 F.3d at 973 (citing *Crotteau*, 218 F.3d at 833; *Hall*, 165 F.3d at 1105; *Daniels*, 64 F.3d at 315; *Larkin*, 978 F.2d at 971; *United States v. Curry*, 977 F.2d 1042, 1052 (7th Cir. 1992)). While recognizing this line of cases, the district court correctly realized that "expert testimony regarding eyewitness identification, memory, and perception is not per se unhelpful." *Welch*, 368 F.3d at 975; *see also Hall*, 165 F.3d at 1104-05 (citing *Curry*, 977 F.2d at 1051-52). Here, the district court exercised discretion by evaluating the facts and circumstances of this particular case in light of our case law and, further, did not abuse its discretion in concluding that this case did not present "an unusual or compelling situation in which the aid of an expert witness is required."

In addition, the district court's decision was bolstered by three "additional considerations." *Hall*, 165 F.3d at 1107. First, Hernandez was cross-examined on his ability to perceive, remember, and identify Carter as the bank robber. *See Welch*, 368 F.3d at 974-75. Second, the government had significant additional evidence (e.g., getaway car, shoe print, crack pipe DNA) to corroborate Hernandez's identification. *See Hall*, 165 F.3d at 1107-08 ("[T]he existence of corroborating evidence undercuts the need, except in the most compelling cases, for expert testimony on eyewitness identifications."). Third, the district court twice cautioned the jurors, through instructions, about assessing witnesses and the risks associated with eyewitness identifications. *See Crotteau*, 218 F.3d at 832-33. These developments—es-

pecially the jury instructions,[2] which effectively gave the jury the same key points on eyewitness identifications that the expert would have presented to them—provide further support for the district court's conclusion that the proposed expert testimony would not assist the jury. The district court did not abuse its discretion.

## C. Defendant's Testimony

Carter next protests the district court's decision to limit his testimony at trial. Carter testified in his own defense by reading, over the government's objection, self-styled "affidavits" into the record. At first, Carter directed this narrative testimony toward undermining his confession to the September 4 robbery, asserting that his extreme intoxication at the time resulted in a false confession. When he reached his fourth "affidavit," his narrative turned to his religious and philosophical beliefs. The government raised a relevancy objection, which the district court sustained. The district court then directed Carter to stick to matters relevant to the trial. Carter ignored the order and returned to

---

[2] The district court's two instructions followed the exact language of our pattern instructions 1.03 and 3.08. *See Crotteau*, 218 F.3d at 832-33. Instruction 3.08 bears repeating here: "You have heard testimony of an identification of a person. Identification testimony is an expression of belief or impression by the witness. You should consider whether, or to what extent, the witness had the ability and the opportunity to observe the person at the time of the offense and to make a reliable identification later. You should also consider the circumstances under which the witness later made the identification. The government has the burden of proving beyond a reasonable doubt that the defendant was the person who committed the crime charged." Seventh Circuit Pattern Criminal Jury Instructions 3.08 (1999).

his commentary. Once seven such warnings were disregarded, the district court, over Carter's protestations, imposed a time limit on the remainder of Carter's testimony pursuant to Federal Rule of Evidence 611(a).[3] The length of the time limit is not discernable from the trial transcript, but Carter's entire direct testimony lasted approximately ninety minutes.[4]

Supposedly, Carter was eventually going to say something about the September 1 robbery. Carter therefore complains that the district court violated his constitutional right to testify in his own defense. *See United States v. Manjarrez*, 258 F.3d 618, 623 (7th Cir. 2001). When an evidentiary ruling "directly implicate[s]" a defendant's constitutional right, *United States v. Hernandez*, 84 F.3d 931, 933 (7th Cir. 1996), we review de novo the question of whether the "evidentiary ruling . . . had the effect of infringing" that right while still "taking into account the permissible scope of the [district] court's discretion" in evidentiary matters, *United States v. Wilson*, 307 F.3d 596, 599 (7th Cir. 2002).

Simply stated, a criminal defendant does not have an absolute, unrestrainable right to spew irrelevant—and thus

---

[3] Fed. R. Evid. 611(a): "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

[4] Carter also testified on cross-examination, but he continually avoided the government's questions by repeating the response, "I stand on my affidavit." *Cf. United States v. Bartelho*, 129 F.3d 663, 672-74 (1st Cir. 1997) (defendant's entire testimony stricken based on his refusal to answer government's questions on cross-examination).

inadmissible—testimony from the witness stand. *See United States v. Lea*, 249 F.3d 632, 642 (7th Cir. 2001) ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.") (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)); Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible."); *see also United States v. Moreno*, 102 F.3d 994, 999 (9th Cir. 1996); *cf. United States v. Pless*, 982 F.2d 1118, 1123 (7th Cir. 1992) (testimony may be "in a narrative form as long as it stays within the bounds of pertinency and materiality") (quoting *United States v. Garcia*, 625 F.2d 162, 169 (7th Cir. 1980)). Furthermore, district courts have the authority to take appropriate measures to control a "stubbornly defiant" defendant. *United States v. Brock*, 159 F.3d 1077, 1079 (7th Cir. 1998) (quoting *Illinois v. Allen*, 397 U.S. 337, 343 (1970)). Unquestionably, Carter's venting of his religious and philosophical views to the jury was irrelevant. Further, Carter provided no reasonable indication that he would end his rant and resume testifying about relevant matters such as the September 1 robbery. The generously patient district court gave Carter seven warnings to stay on point, yet Carter doggedly refused. Had Carter wished to discuss the September 1 robbery, he had ample opportunity. Consequently, Carter can assign fault to no one but himself. In sum, the district court did not err in limiting Carter's trial testimony because Carter flagrantly and incessantly ignored the district court's repeated orders to avoid irrelevant matters.

## D. Sufficient Evidence

Carter also challenges the sufficiency of the evidence presented by the government for his conviction on count one,

the September 1 robbery. The essential question in such a challenge is whether, in viewing the evidence in the light most favorable to the government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Arocho*, 305 F.3d 627, 639 (7th Cir. 2002). "We neither reweigh the evidence nor assess the credibility of the witnesses." *Id.* In short, we will overturn a conviction only when "the record contains no evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *Id.* (internal quotation omitted).

To have convicted Carter of bank robbery under 18 U.S.C. § 2113(a) for the bank robbery alleged in count one, the jury was required to find beyond a reasonable doubt that (1) Carter took from the person or presence of another money belonging to Firstar Bank, (2) the bank was federally insured, and (3) Carter acted to take such money by force and violence or by intimidation. *See* Seventh Circuit Pattern Criminal Jury Instructions 18 U.S.C. § 2113 (1999). The second element concerning federal jurisdiction is not in dispute. Carter attacks the first and third elements only by arguing that the government's evidence failed to show that he was the bank robber.

The government linked Carter to the September 1 robbery in five ways. First, Hernandez, an eyewitness, identified Carter as the robber. Second, the license plate number on the September 1 getaway car matched a car lent to Carter by a family member from August 30 to September 3. Third, in the car, a crumpled note was present that stated: "Relax, this is a stick-up. Don't do nothing." Fourth, DNA from saliva on a crack pipe found at the bank matched Carter's DNA. Fifth, shoe prints left by the robber jumping on the teller counter matched the size, make, and model of the shoes that Carter was wearing at the time of his arrest. In response,

Carter contends that Hernandez misidentified him; that the getaway car was tied to family members who were initially suspects in the robbery but who lied to the authorities about Carter; that none of the (testable) fingerprints recovered from the bank and the car matched Carter's prints; that the robber did not wear gloves; that, besides Carter's DNA, at least one other person's DNA was found on the pipe; and that, as the shoes in question were mass produced, other individuals also possessed the same make, model, and size of the shoes that left the prints at the bank. Carter presented these contentions of innocence to the jury, and the jury rejected them. Carter's approach on appeal invites us to reweigh the evidence. That is not our role. Rather, we must take the evidence in a light most favorable to the government and then determine if there is evidence to convict. In that light, there is more than enough evidence of guilt in this case to find, beyond a reasonable doubt, that Carter was the September 1 robber. Carter's conviction for the bank robbery charged in count one is accordingly affirmed.

### III.

As for sentencing, Carter contests his sentence on counts one and two. He does not appeal count three in any respect. Under the mandatory guidelines, the district court formulated Carter's sentence on count one by starting with the base offense level for robbery, twenty levels, and adding two levels for taking property from a financial institution, four levels for using a dangerous weapon, and two levels for obstructing justice. *See* U.S.S.G. §§ 2B3.1(a), (b)(1), (b)(2)(D), 3C1.1 (2003). Thus, the September 1 robbery carried an adjusted offense level of 28. For count two, the district court again began with the twenty-level base and added two levels for the financial institution, two levels for physically restraining a person, one level for stealing more

than $10,000, two levels for obstructing justice, and two levels for recklessly endangering others in the course of fleeing from a law enforcement officer. *See* U.S.S.G. §§ 2B3.1(a), 2B3.1(b)(1), (b)(4)(B), (b)(7)(B), 3C1.1, 3C1.2 (2003). The September 4 robbery thus resulted in an adjusted offense level of 29. Then, pursuant to the grouping procedures for multiple counts, the district court applied U.S.S.G. § 3D1.4 and arrived at a combined adjusted offense level of 31 for count one and count two, which would be served concurrently. Level 31, with Carter's category VI criminal history, translated into a sentencing range of 188-235 months, and the district court sentenced at the bottom of that range.

On appeal, in addition to attacking two enhancements, physical restraint in count two and obstruction of justice in each count, Carter raises what is now a *Booker* challenge to his sentence under the Sixth Amendment. *United States v. Booker*, 125 S. Ct. 738 (2005). Under *Booker*, the formerly mandatory federal sentencing guidelines have become advisory. *See id.* at 767. We will address Carter's *Booker* argument first.

## A. *Booker*

According to *Booker*, a sentence violates the Sixth Amendment when it exceeds the maximum sentence authorized through the facts established by a jury verdict or a guilty plea or by facts otherwise admitted to by the defendant. 125 S. Ct. at 756. Here, the jury's bank robbery verdicts authorized the base offense level and also permitted the inclusion of the financial institution enhancement in the calculation. Additionally, at sentencing, Carter conceded the applicability of the dangerous weapon enhancement in count one. As to the rest, they were imposed as the result of

judge-found facts. Carter's sentence thus runs afoul of the Sixth Amendment, as interpreted by *Booker*, because, under the mandatory guidelines, the sentence exceeded the maximum sentence authorized by the facts admitted by Carter or established by the jury's verdicts. 125 S. Ct. at 756. Carter, however, did not raise this Sixth Amendment argument before the district court. The matter is therefore governed by the plain-error standard of review and our recent decision in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005). Pursuant to *Paladino*, a limited remand is required in this case to ascertain whether the Sixth Amendment error was prejudicial. *See id.* at 483-85. Specifically, under the *Paladino* procedure, we will retain jurisdiction over the appeal while ordering "a limited remand to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence." *Id.* at 484.

To assist the district court in its deliberations on limited remand, we next turn to Carter's contentions that the district court misapplied the guidelines, which, although no longer mandatory, must still be consulted. *See Booker*, 125 S. Ct. at 767; *United States v. Parra*, 402 F.3d 752, 766-67 (7th Cir. 2005). Again, Carter contests the physical restraint enhancement in count two and the obstruction of justice enhancements in each count.

### B. Physical Restraint

The district court included the physical restraint enhancement in its sentencing decision because Carter, to facilitate the September 4 robbery, forced teller Rosa Martinez from the bank's vault to her teller drawer at the point of a gun. Section 2B3.1(b)(4) permits a two-level increase when "any person was physically restrained to facilitate commission of

the offense." Application Note 1(K) of § 1B1.1 further provides that " '[p]hysical restraint' means the forcible restraint of the victim such as by being tied, bound, or locked up." In *United States v. Doubet*, we stated that the qualifying phrase "such as" in this definition indicates that the words "tied, bound, or locked up" "are listed by way of example rather than limitation." 969 F.2d 341, 346 (7th Cir. 1992) (quoting *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989)).

Carter opposes the enhancement on account of the lack of bodily contact with or confinement of Martinez. The issue, however, is physical or forcible restraint. Such restraint is not present, as Carter contends and as we observed in *Doubet*, when an armed robber simply orders his victims not to move during an armed robbery. 969 F.2d at 346. For if it were, the enhancement would be rendered meaningless as it would apply in virtually every armed robbery—"a threat not to move is implicit in the very nature of armed robbery." *Id.* Accordingly, for the enhancement to apply, something more is required, and, here, we have something more. Carter, in the immediate presence of Martinez, focused his gun on her and then, sustaining that focus, moved her out of the bank's vault to her drawer against her will. The sustained focus of the weapon on the victim coupled with the compelled movement of the victim to another area constitutes sufficient forcible restraint to warrant the enhancement. As we held in *Doubet*, "[f]orce is not limited to physical force, but may also encompass the operation of circumstances that permit no alternative to compliance." *Id.* at 347 (quotation omitted). Here, with Carter's gun pointed at her from only inches away, Martinez had no alternative but to comply with his instructions to move. Carter's conduct was thus more culpable than a robber who does not forcibly restrain a victim to

facilitate his offense, *see id.*; therefore, the district court correctly took Carter's restraint of Martinez into account in sentencing Carter.

### C. Obstructing Justice

Carter obstructed justice, according to the district court, by committing perjury during his trial testimony, specifically, by lying about his confession and its surrounding circumstances. For purposes of the two-level enhancement in § 3C1.1, a defendant obstructs justice by committing perjury if the defendant willingly intends to provide false testimony under oath on a material issue. *See United States v. Saunders*, 359 F.3d 874, 878-79 (7th Cir. 2004).

Carter's confession was a material piece of evidence that went to his guilt on the bank robbery charge in count two, and Carter used his trial testimony to undermine that evidence. As mentioned above, Carter began his narrative testimony by asserting that his inebriated state at the time of his questioning resulted in a bogus confession. According to Carter, he was "so totally blown away" by a "three-day" "illegal drugs and alcohol" "binge" that nothing he told his interrogators could have been truthful. Carter testified that he said what he said "only to put a stop to all the questioning" because he "was totally wasted" and wanted to get "away long enough . . . to reach a safe haven and calm down." Carter's account is contradicted by FBI agent Bruce Harford's testimony. While Carter declared that he was "hallucinating," "stoned out of [his] mind," "thoroughly confused," and unable to "understand anything of the line of questioning that was going on," Harford testified that Carter was coherent, responsive, and aware of what was being asked. Carter further averred that the agents directed and manufactured his confession. Harford, how-

ever, testified that, after about a forty-five minute question-and-answer session in which Carter admitted many aspects of the September 4 robbery, he asked Carter if Carter was willing to prepare a signed statement, and, when Carter agreed, he gave Carter a blank piece of paper and pen, which Carter used to author his confession. Also, Carter denied signing his handwritten confession, but Harford testified that he witnessed Carter's signature on the confession. The district court found Harford to be truthful and Carter untruthful, and, on this record, the district court did not err in including an obstruction enhancement on count two. *See United States v. Hall*, 101 F.3d 1174, 1178-79 (7th Cir. 1996).

The obstruction enhancement is more problematic on count one, the September 1 robbery, because Carter's confession only related to the September 4 robbery. The government attempts to stretch Carter's claims about his three-day binge to the September 1 robbery, but the record does not indicate that he somehow lied on the witness stand about the September 1 robbery. He simply did not discuss it. Nonetheless, applying the obstruction enhancement in count one was a harmless error. *See* Fed. R. Crim. P. 52(a). As indicated above, counts one and two were grouped for guideline purposes under § 3D1.4. Recall that the adjusted offense levels for counts one and two were 28 and 29, respectively. Under the intricacies of § 3D1.4, count one's offense level would have had to be 24 or lower to make a difference in the combined offense level and the applicable guideline range. Since the obstruction error was only a two-level error (i.e., the offense level would have been 26), it was harmless because it had no effect on Carter's sentencing range and sentence at the bottom of that range. *See United States v. Woods*, 233 F.3d 482, 485-86 n.5 (7th Cir. 2000).

## IV.

We AFFIRM Carter's conviction in all respects. The district court correctly refrained from suppressing the contested eyewitness identification. The district court did not abuse its discretion in rejecting Carter's memory expert. The district court did not err in limiting Carter's trial testimony, and the government presented sufficient evidence to convict Carter on the bank robbery charged in count one. As to sentencing, the district court correctly included the physical restraint and obstruction of justice enhancements in count two, and the inclusion of the obstruction enhancement in count one was harmless. Nonetheless, given *Booker*, we order a LIMITED REMAND to the district court for further proceedings consistent with *Paladino* and this opinion. Pending the outcome of the limited remand, we retain jurisdiction over this appeal.

A true Copy:

       Teste:

                              _____

                              *Clerk of the United States Court of*
                              *Appeals for the Seventh Circuit*